Anthony SPARMAN, Petitioner,

v.

Ernest EDWARDS, Superintendent
Otisville Correctional Facility,
Respondent.

No. 95–CV–4689 (JG).

United States District Court,
E.D. New York.

Oct. 2, 1997.

Robert J. Anello, Eric Markovich, Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., New York City, for the petitioner.

Charles J. Hynes, District Attorney of Kings County, Brooklyn, NY, by Anthea H. Bruffee, Assistant District Attorney.

### MEMORANDUM AND ORDER

GLEESON, District Judge.

On October 19, 1992, a jury convicted Anthony Sparman ("Sparman" or "petitioner") of repeatedly raping his twin nieces, Annatasha ("Anna") and Donnasha ("Donna"). On November 9, 1992, Sparman was sentenced to a term of incarceration of three to nine years. After unsuccessfully pursuing relief in state court, petitioner brought this habeas corpus petition, alleging that (1) his trial counsel was ineffective; (2) a state court evidentiary ruling was unconstitutional; and (3) the prosecutor's summation was improper and prejudicial.

I referred the petition to Magistrate Judge Joan Azrack for a Report and Recommendation. Judge Azrack filed her report on September 27, 1996, in which she recommended that I grant the petition based on trial counsel's performance, which she described as "grossly ineffective" and "severely prejudic[ial]" to petitioner. Specifically, Judge Azrack concluded that trial counsel rendered ineffective assistance in, *inter alia,* three primary ways: (1) he did not adequately investi-

gate the case, and thus was unaware that Marie Onyema saw Alfred Sparman, petitioner's half-brother, sexually abusing Anna in 1991; (2) he did not elicit favorable medical evidence that tended to show that any sexual abuse that the twins suffered occurred subsequent to the nineteen-month period ending in April 1988, in which petitioner allegedly sexually abused the twins; and (3) he failed to cross-examine the twins on material inconsistencies between their testimony at trial and statements they made to the police. A copy of Judge Azrack's report and recommendation is attached to this memorandum.

After reviewing Magistrate Judge Azrack's report, the transcript of the oral argument before her on May 23, 1996, respondent's objections to the Report and Recommendation and the petitioner's submissions with respect thereto, I ordered that an evidentiary hearing be held on the following issues: (1) what trial counsel was told by petitioner with respect to Marie Onyema; (2) the nature and value to the defense of the medical evidence not presented at trial; and (3) the reasons for trial counsel's failure to cross-examine the twins on their inconsistent statements. An evidentiary hearing was held on March 4, 1997, at which Dr. Cynthia Yvonne Stevens, Dr. Karen Woodburn–Hourie and trial counsel, Jay Schwitzman, testified, and post-hearing submissions have been filed by both parties. Except as indicated below, I adopt the report of Magistrate Judge Azrack. I further adopt her recommendation that Sparman's petition for a writ of habeas corpus be granted.

### BACKGROUND

Between September 1986 and April 1988, petitioner lived with his half-brother Alfred Sparman, Alfred's wife, his mother, a nurse and Alfred's twin girls (Anna and Donna). It is during this period of time that respondent claims petitioner repeatedly raped the twin girls. Indeed, both sides agree that after petitioner moved out of Alfred's home in April 1988, he had little contact with his nieces.

The allegation that petitioner sexually abused the twins first surfaced on July 20, 1991, when Alfred took the twins to the police station, purportedly on the first day that Alfred became aware that they had been abused. While there, according to the police reports, the twins told the police that petitioner had sexual intercourse with them "over the last 4 years."

Petitioner contends that any sexual abuse suffered by the twins occurred after April 1988 and was likely inflicted by Alfred, not him. In support of this argument, petitioner details a long history of animosity between the two and notes that Alfred was on the eve of trial on charges of sexually abusing an eighteen year-old female when he brought the twins to the police station in July 1991 to file charges against petitioner. Most importantly, petitioner also claims that trial counsel failed to investigate and present medical evidence that could have established that petitioner was not the perpetrator because the twins were not abused prior to April 1988, the date he moved out of Alfred's home.

### DISCUSSION

#### A. Marie Onyema

Sparman argues that his trial counsel was ineffective for failing to investigate and pursue his pre-trial suggestion to contact Marie Onyema, who allegedly saw Alfred Sparman abusing the twins in 1991. This piece of evidence, according to Sparman, could have raised doubts as to the identity of the perpetrator and would have permitted the introduction into evidence of Alfred Sparman's 1991 conviction for sexual abuse. This argument is without merit.

The uncontradicted evidence at the hearing was that Sparman never told his counsel to interview Onyema. Tr. at 59.[1] Indeed, prior to trial, Sparman wrote a five-page letter to his counsel in which he detailed his defense, and nowhere in that letter did he mention Marie Onyema or any possible testimony that she could provide. Petitioner's Hearing Exhibit 3.

In any event, petitioner was not prejudiced by counsel's failure to interview Onyema. Although Onyema signed an affidavit on No-

---

1. "Tr." refers to the transcript of the evidentiary hearing held on March 4, 1997.

vember 30, 1994, in which she stated that she saw Alfred Sparman sexually interacting with Anna in 1991, she has since recanted that statement. By affidavit signed March 3, 1997, Onyema stated that she did not carefully read the prior affidavit, and that its contents were not true.

This ground of the petition reeks of a crude post-conviction effort to fabricate exculpatory evidence and blame trial counsel for failing to present it. Onyema is described by petitioner as a former girlfriend of Alfred Sparman, which is apparently true. However, she is also a former *wife* of petitioner himself, a fact petitioner chose not to reveal to Judge Azrack.

Accordingly, trial counsel did not fall short of his constitutional obligations by failing to interview Marie Onyema.

B. *The Medical Evidence Not Offered At Trial*

█ Petitioner contends that trial counsel rendered ineffective assistance by failing to introduce essential medical evidence and testimony that could have exonerated him. I agree.

At petitioner's trial, the prosecution presented the testimony of Dr. Mohammed Baker, which supported the twins' account of Sparman's sexual abuse. Specifically, in 1991, shortly after the twins' interviews with the police, Dr. Baker performed gynecological exams on both girls and found tears in their hymens and redness and abrasions in their vaginas. Dr. Baker further testified that these physical signs were consistent with penile penetration as much as four years earlier, but could also reflect recent sexual activity. In addition, Dr. Baker noticed a whitish discharge from Anna's, but not Donna's, vagina, which was later determined to be gardnerella vaginalis, a bacterial infection that can be transmitted sexually.

To combat this medical evidence, petitioner's trial counsel presented the testimony of Dr. Paula Nadig, a pediatrician who examined the twins on September 13, 1988, several months after Sparman had moved out of the twins' residence. Dr. Nadig concluded

that Anna and Donna were both "normal female[s], virgin[s]." Trial Tr. at 392–93, 404.[2] Accordingly, her findings were "inconsistent with sexual intercourse." Trial Tr. at 405. The purpose of this testimony was to establish that, even if the girls were abused as of 1991, they were not molested by anyone prior to September 13, 1988, and thus, petitioner did not abuse the twins. However, on cross-examination, the prosecutor successfully discredited Dr. Nadig's findings by noting that the examinations were very fast, and that Dr. Nadig did not use stirrups or bright lights, look at the girls' hymens, take any specimens from them or instruct them to completely take off their underwear. Trial Tr. at 410–412. Accordingly, in summation, the prosecutor derided Dr. Nadig's findings as "offensive," telling the jury that they had heard about her examination and about "how quick, how brief, and how incomplete it was." Trial Tr. at 725, 702.

Although trial counsel was aware, in advance of the trial, of the importance of the medical testimony in this case, he consistently failed to adequately investigate whether he could have offered additional evidence in support of the argument that the twins were not abused prior to April of 1988. On May 5, 1992, counsel received Dr. Baker's medical reports. It took four months, until September 2, 1992, for trial counsel to send these documents to an expert, Dr. Leonard F. Rosenzweig, to review them. Within two weeks, Dr. Rosenzweig communicated to counsel his analysis of Dr. Baker's reports. On September 21, 1992, two weeks before trial, the prosecutor turned over to petitioner's trial counsel roughly ten pages of additional medical reports, which described physical examinations that occurred between April 1988 and Dr. Baker's examination in July of 1991. One report noted that a Dr. Hourie performed a "physical exam" on both of the twins on June 24, 1991, just one month before Dr. Baker's exam, and that the girls were "doing well" and had "no complaints." Another report indicated that a Dr. Stevens, after noticing "yeast like cells," collected a fungus culture from Anna's vagina on Janu-

---

2. "Trial Tr." refers to the transcript of Anthony Sparman's state court trial.

ary 29, 1990, and she received a microbiology report analyzing that culture.

Petitioner's trial counsel did nothing to investigate the contents of these reports. Indeed, he did not contact the doctors who wrote them (Dr. Stevens and Dr. Hourie) or request that another doctor review them. In so doing, he failed to present powerful exculpatory testimony.[3]

Dr. Stevens examined the twins in January 1990 and November 1990, and Dr. Hourie examined them in June 1991. Tr. at 13, 21, 118. At the hearing on this petition, Dr. Hourie testified that she did not notice any tears or abrasions in the girls' vaginas, and had those signs been present, she would have noticed them when she examined the twins. Tr. at 122. In addition, Dr. Hourie observed that the girls' hymens were intact. Tr. at 121. Drs. Stevens and Hourie also testified at the hearing that gardnerella, a sexually transmitted disease found by Dr. Baker in his July 1991 exam of Anna, was not present in either girl at the time of the girls' examinations.[4] Finally, both Drs. Stevens and Hourie testified that Dr. Baker's conclusion that redness can linger in a child's vagina for over three years after sexual abuse had ceased was unfounded. Tr. at 32, 123, 125, 133.

Therefore, had counsel adequately investigated the case and called Drs. Stevens and Hourie to testify at petitioner's trial, counsel could have raised serious doubts as to whether the twins were in fact abused prior to April of 1988, as they had testified. Indeed, if the jury believed the doctors' testimony, it would likely have concluded that the twins were abused sometime after Dr. Hourie's examination in June of 1991, since, as of that time, there was no redness in the girls' vagi-

nas and Anna had not yet contracted gardnerella. There is no controversy that petitioner had almost no contact with the twins in 1991. Accordingly, the jury would likely have concluded that petitioner could not have committed the crime charged.

At the hearing, trial counsel offered only specious arguments as to why he did not present the testimony of Drs. Stevens and Hourie.[5] Counsel first contended that he did not know if the reference to "yeast like cells" in Dr. Stevens' report was consistent with sexual abuse, and he "did not want to find out in front of a jury." Tr. at 87–88. This explanation demonstrates how little preparation occurred prior to trial. If this indeed were his concern, counsel could have simply telephoned Dr. Stevens or any other doctor to learn the causes of a yeast infection, which do not include sexual contact. In addition, counsel testified that he learned that yeast infections were common in young girls during petitioner's trial. Tr. at 91; see Trial Tr. at 407. Therefore, counsel's argument does not explain why, after this discovery, he did not seek to use the testimony of Dr. Stevens or Dr. Hourie.

Trial counsel further testified to an "impression" that Dr. Stevens was not available, although he did not "remember if it was Dr. Nadig that said that." Tr. at 145. Counsel also explained that "[f]or some reason I remember looking for a Dr. Martin rather than a Dr. Stevens." Id. As for Dr. Hourie, counsel's only explanation for failing to make any attempt to contact her was that "her notes were very small." Tr. at 146. These explanations are not sufficient. Counsel's failure even to contact the HIP Center, where the girls were examined, see Tr. at 150, is incomprehensible.

---

3. Although neither Dr. Stevens nor Dr. Hourie were contacted by defense counsel, the prosecutor contacted Dr. Stevens, but elected not to call her as a witness because her testimony would not have helped the prosecution's case. Tr. at 22–23, 124.

4. In fact, Dr. Stevens performed a vaginal swab on Anna in January 1990 because she noticed a white, cheesy and odorless discharge from her vagina. Tr. at 15, 19. Dr. Stevens interpreted this discharge to be the result of a yeast infection, not gardnerella, since a discharge caused by

gardnerella would be "thinner, greenish yellowish and it would have had a distinct fishy odor to it." Tr. at 19. This impression was confirmed after Dr. Stevens sent the culture to the laboratory for analysis. Tr. at 19–20, 28. Yeast infections, unlike gardnerella, are not sexually transmitted and are, in fact, common in young girls. Tr. at 15, 124.

5. Counsel conceded at the hearing that his allegiances were with the respondent since he did not feel that his representation of the petitioner was constitutionally inadequate.

Respondent's final argument is that trial counsel "made a tactical decision to rely on Dr. Nadig's testimony, which counsel reasonably believed would be more timely and helpful than that of the other doctors." This opinion, however, was not offered by trial counsel at the hearing. More importantly, counsel failed to investigate the potential strength of Dr. Stevens' and Dr. Hourie's potential testimony in order to make an informed decision as to whether to use their testimony at trial. Had he done so, a decision not to call both Drs. Stevens and Hourie would have been irrational.

In fact, the record demonstrates that counsel failed to investigate the contents of the medical reports provided to him on September 21, 1992, two weeks before trial, and that he appreciated the significance of that failure. He requested "numerous adjournments," Tr. at 73–74, and on October 16, 1992, just before closing arguments, he requested that the charges against his client be dismissed for, among other reasons, the prosecution's failure to turn over essential medical evidence until two weeks before trial. Accordingly, counsel realized the essential character of the medical reports written by Drs. Stevens and Hourie; he just neglected to find the time to investigate them.

In sum, counsel did not pursue basic avenues of investigation, which would have led to the discovery of Drs. Stevens and Hourie, whose testimony at trial might well have resulted in petitioner's acquittal. This failure alone, given the importance of the medical testimony in this case, denied petitioner the right to counsel guaranteed to him by the Sixth Amendment and the corollary right to a fair trial. *See Dorsey v. Kelly*, 92 Civ. 8943, 1997 WL 400211 (S.D.N.Y. July 16, 1997) (quoting *Kimmelman v. Morrison*, 477 U.S. 365, 383, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986)) (one "single, serious error may support a claim of ineffective assistance of counsel").[6]

## C. The Cross–Examination Of The Twins

■ At petitioner's trial, the prosecution's theory, supported by the twins' testimony, was that petitioner abused the twins while he was living with them between September 1986 and April 1988, and that the abuse ended when Sparman moved out of the house in April 1988. *See, e.g.*, Trial Tr. at 104, 202; Tr. at 101. However, according to police reports, the twins stated to the police in 1991, when they first complained of abuse, that they had been abused "until recently" and "over the last four years." Petitioner's Hearing Exhibits 8, 9 and 10. Inexplicably, trial counsel failed to cross-examine the twins about this inconsistency, even though it supported the defense theory that Anthony Sparman was not the perpetrator, and that someone else, likely Alfred Sparman, abused the children after Anthony Sparman left the twins' house.[7]

---

**6.** In *Dorsey*, the court was presented with similar, albeit less egregious, facts than those at issue here. Dorsey was convicted of sodomy for forcing a thirteen year-old learning disabled boy to engage in anal sex with him. At trial, in addition to the victim's testimony, the prosecution relied on medical and scientific evidence, including the fact that sperm stains were found on the victim's underpants. The prosecution argued in summation that the semen causing those stains "probably came out of [petitioner's] penis." *Id.* 1997 WL 400211 at *7.

In his habeas petition, petitioner presented documents prepared by a police department chemist, which trial counsel possessed but did not offer at trial, indicating that the semen in the victim's underwear "could not have originated from Mr. Dorsey, but must have come from some other person whose physiological fluids contain the A antigenic character." *Id.* 1997 WL 400211 at *8. Furthermore, the stains on the underwear "could have come from [complainant] exclusively." *Id.* However, petitioner conceded that "it is possible that the antigens found on the underwear are the result of a mixture of antigens originating from [complainant] and Mr. Dorsey (or some third person), but the testing done neither supports nor excludes this possibility." *Id.*

Even though this evidence did not, standing on its own, tend to establish that petitioner could not have sodomized the victim, the court concluded that it would "have substantially helped petitioner's case." *Id.* 1997 WL 400211 at *10. Accordingly, the court held that trial counsel's failure to present this medical evidence to the jury violated petitioner's Sixth Amendment right to effective assistance of counsel.

**7.** There were other material inconsistencies between the statements attributed to the twins in the police reports and their testimony at trial that counsel failed to bring to the jury's attention, including: (1) in the police reports, the twins claimed that they did not tell anyone about Spar-

At the hearing, trial counsel explained that he did not cross-examine the twins about the statements that they made to the police because he feared that such questioning would open the door to the presentation of evidence on an incident in 1991, where petitioner asked Anna whether he could kiss her.[8] This argument is wholly unpersuasive.

First, counsel's concern over the presentation of evidence on the 1991 incident is difficult to fathom. Petitioner was charged with raping the twins on an almost daily basis over at least a two and one-half year period. In that context, it was not a rational trial strategy to avoid using likely damaging impeachment material so as to avoid testimony on a single, additional, isolated incident of an attempted physical advance.

Second, Donna did not testify, at any point, that she had been subjected to sexual abuse at the hands of petitioner after 1988. Therefore, counsel could have cross-examined her about her statements to the police without any concern that she might further inculpate petitioner.

Third, counsel's inartful cross-examination of Anna opened the door, in any event, to the testimony that counsel now claims he sought to preclude; Anna testified about the 1991 incident. Once that testimony was received into evidence, counsel no longer had even this lame reason for failing to cross-examine Anna on her inconsistent statements to the police. Nevertheless, he failed to do so.

## CONCLUSION

To the extent and for the reasons stated above, I adopt the attached Report and Rec-

ommendation of Magistrate Azrack and grant Sparman's petition for a writ of habeas corpus. Respondent is directed to release petitioner from custody within 45 days of the date of this order unless the state declares its intention, before those 45 days expire, to re-try petitioner on the charges against him.

## REPORT AND RECOMMENDATION

AZRACK, United States Magistrate Judge.

The above-referenced action was referred to the undersigned by the Honorable John Gleeson, United States District Judge, for a Report and Recommendation on Anthony Sparman's petition for a writ of habeas corpus. After careful review of the record, the briefs submitted by both sides and their respective oral arguments, it is respectfully recommended that the petition be granted.

On October 19, 1992, a jury convicted petitioner of eight counts of statutory rape and eight counts of incest pursuant to New York Penal Law Sections 130.35 [1] and 255.25,[2] respectively. The conviction was based on evidence that petitioner, a six foot four inch male, repeatedly raped, on almost a daily basis, his twin nieces, Annatasha ("Anna") and Donnasha ("Donna"), during the period when he lived with his half-brother's family, from September 1986 to April 1988 when the twins were six to eight years old. On November 9, 1992 the court sentenced petitioner to a prison term of from three to nine years.

---

man's sexual abuse out of fear that he would hurt them; at trial, they testified that they kept silent because they loved Sparman and wanted him to be their friend; (2) in the reports, they stated that the abuse usually happened in the bathroom, but they testified at trial that it happened only once or twice in the bathroom. Respondent has not presented any explanation for counsel's failure to cross-examine the twins on these issues.

**8.** There was no allegation that petitioner took out his penis on this occasion or engaged in any other form of sexual abuse.

**1.** "A male is guilty of rape in the first degree when he engages in sexual intercourse with a female:

    1. By forcible compulsion; or
    2. Who is incapable of consent by reason of being physically helpless; or
    3. Who is less than eleven years old."
N.Y. Penal Law § 130.35 (McKinney 1987).

**2.** "A person is guilty of incest when he or she marries or engages in sexual intercourse or deviate sexual intercourse with a person whom he or she knows to be related to him or her, either legitimately or out of wedlock, as an ancestor, descendant, brother or sister of either the whole or the half blood, uncle, aunt, nephew or niece." N.Y. Penal Law § 255.25 (McKinney 1987).

Presently, petitioner argues that relief is warranted because: (1) his trial counsel was constitutionally ineffective; (2) a key trial court evidentiary ruling barring the admission of the victims' father's arrest and conviction for the sexual abuse of an eighteen year old co-worker was unconstitutional; and, (3) the prosecutor's summation was improper and prejudicial.

The principal thrust of petitioner's ineffective assistance of counsel argument is, in summary, that due to the incompetence of his trial counsel to both investigate and argue petitioner's case at trial, petitioner was precluded from presenting a coherent and compelling defense that he was innocent. The critical evidence which was not offered at trial included: (1) four medical examinations of Anna Sparman, two of which included genital examinations as well as a vaginal swab, that failed to show any signs of abuse on Anna in the months and years between April 1988, the date of the last charged crime, and July 1991, when an examination first revealed evidence of sexual abuse; (2) testimony that petitioner's half-brother, Alfred Sparman, the father of Anna and Donna, was seen by Alfred's girlfriend, Marie Onyema, sexually abusing Anna only weeks before that July 1991 examination; and (3) evidence casting doubt on the prosecution doctor's conclusions that the physical signs of sexual abuse he observed in July 1991 were a product of petitioner's alleged sexual abuse of the victims at least three years earlier.

Moreover, continues petitioner, the testimony regarding Alfred's reported sexual abuse of his own daughter, Anna, in 1991 would have established the requisite evidentiary link under state law to entitle petitioner to introduce at trial Alfred's arrest and conviction for the Sexual Abuse in the First Degree[3] of an eighteen year old co-worker, rendered just nine days after the sexual abuse of his own daughters' was discovered. This evidence, argues petitioner, when combined with other evidence of an ongoing bitter intra-family feud, provided Alfred—as the true perpetrator—with strong motivation to frame his half-brother, the petitioner, for the abuse of the twins.

In addition to his ineffective assistance of counsel claim, petitioner also claims that the trial court's ruling barring petitioner's counsel from presenting any evidence of Alfred Sparman's sexual abuse conviction was unconstitutional and that the prosecutor's summation was improper, prejudiced the jury and rendered the trial fundamentally unfair.

This Court finds that petitioner's trial counsel was ineffective and that petitioner was severely prejudiced by this ineffectiveness. Petitioner's remaining claims are not meritorious.

## I. *Background and Evidence Presented at Trial*

### A.  *The Sparman Family*

From 1986 to 1988, the period during which the State asserts Anna and Donna were repeatedly raped, petitioner lived with his half-brother, Alfred Sparman; his brother's wife, Paulette; petitioner's mother, Olga Sparman, a nurse; and the twins, Anna and Donna, in a two bedroom apartment in Brooklyn, New York. It is uncontested that during most of this period Alfred Sparman was away at medical school in upstate New York. Alfred Sparman returned to his home in June 1990. It is also uncontested that in or about the end of April 1988, the date of the last charged crime, petitioner moved out of his half-brother's home and petitioner had no significant contact with his twin nieces after that date.

Petitioner asserts that his relationship with his half-brother prior to petitioner's 1992 trial was strained and that deep and bitter divisions existed in the Sparman family. Affidavit of Anthony Sparman, Pet. Exhibit "X" (hereinafter "Sparman Affidavit"). Petitioner contends that these divisions

---

**3.**  "A person is guilty of Sexual Abuse in the First Degree when he subjects another person to sexual contact:

    1) By forcible compulsion; or

    2) When the other person is incapable of consent by reason of being physically helpless; or

    3) When the other person is less than eleven years old."

N.Y. Penal Law § 130.65 (McKinney 1987).

stemmed initially from his emigration to the United States from Guyana and his failure to provide assistance to Georgiana Devonish,[4] petitioner's half-sister, and her three children, who were still living in Guyana. Sparman Affidavit at ¶ 5. Petitioner asserts that the family became further divided because petitioner refused to continue to provide financial support to Alfred's family while Alfred was away at medical school. *Id.*

Petitioner maintains that another wedge between petitioner and Alfred developed in 1990 when Alfred moved in with petitioner following a temporary separation from his wife. *Id.* at ¶ 6. Shortly after Alfred moved in, petitioner claims that he asked Alfred to leave because Olga Sparman, Anthony's and Alfred's mother, discovered Alfred having sex, with a woman other than his wife, in petitioner's home. Finally, petitioner maintains that he "enraged" Alfred by refusing to lend him money to fund Alfred's legal expenses following Alfred's arrest for sexual abuse of a female co-worker in early 1991. *Id.* at ¶ 8.

### B. The Trial Court's "Clear Link" Evidentiary Ruling

Prior to trial, defense counsel sought permission to introduce proof at trial of Alfred Sparman's 1991 conviction for Sexual Abuse in the First Degree to help show that Alfred, not petitioner, was responsible for abusing the twins. That conviction stemmed from a January 14, 1991 arrest in Onondaga County where an eighteen year old co-worker charged that Alfred had sexually assaulted her in a doctors' lounge of a hospital. (Trial Transcript at 18) (hereinafter "Tr."). In denying defense counsel's motion, the trial court relied on a New York state rule of evidence known as "clear link," which holds that in order for a defendant to argue that a third person committed the crime with which the defendant is charged, the defendant must present facts or circumstances that clearly implicate that third person as the guilty party. *People v. Aulet,* 111 A.D.2d 822, 825, 490 N.Y.S.2d 567, 570 (2d Dept.1985); *People v. Brown,* 133 A.D.2d 773, 774, 520 N.Y.S.2d

166 (1987), *app. den.,* 70 N.Y.2d 953, 525 N.Y.S.2d 837, 520 N.E.2d 555 (1988).

Defense counsel's failed argument appeared to be that the timing of Alfred Sparman's sex abuse trial, scheduled to begin nine days after the discovery of the twins' abuse, coupled with earlier charges against Alfred for criminal impersonation and falsification of medical reports, sufficiently linked him to the abuse of the twins. (Tr. at 18–19). In particular, defense counsel attempted to argue that Alfred's then-pending sex abuse trial provided Alfred with a motive to manipulate the twins' statements to the police and their testimony at trial. (Tr. at 19, 256–7).

Based on the limited support offered by trial counsel, the trial court rejected petitioner's clear link argument and stated that "I am satisfied that this is not a clear link that establishes that the father committed the crime, and under the circumstances, I am not going to allow you to bring it out during the course of the trial, whether by cross-examination of the twins or any other way." (Tr. at 19). Later in the trial, the court underscored its ruling when it denied defense counsel permission to call Alfred Sparman to the stand in order to question Alfred about his sexual abuse arrest and his motive to frame petitioner. (Tr. at 257–58).

### C. Evidence at Trial

The evidence presented against petitioner at trial consisted chiefly of Anna's and Donna's testimony concerning the abuse, petitioner's incriminating statements allegedly made to Georgiana Devonish in 1987, contemporaneous statements the twins made to their cousin, Natasha, in Guyana in 1987, and medical testimony and evidence based on a July 20, 1991 examination of the twins, which showed physical signs of their sexual abuse.

At trial, the twins testified that from 1986–1988 petitioner raped them on almost a daily basis in their Brooklyn apartment. The twins stated that on weekdays, after they got home from school, petitioner would call one of them into the bedroom. (Tr. at 76, 149). Once in the bedroom, the twins testified, petitioner would direct them to take off their

---

4. Georgiana Devonish sometimes appears by the name "Jennifer" in the state court records.

clothes and then tell them that they were going to "wrestle." (Tr. at 76, 149). The children then testified that petitioner would insert his penis into their vaginas. (Tr. at 78, 149). During this two year period, the twins' ages ranged from six to eight years.

Natasha Sparman, the twins' cousin, testified that during a 1987 trip to Guyana when Natasha was eleven years old, the twins told her about the abuse. (Tr. at 138). Although told to keep the abuse secret, Natasha confided in her mother, Georgiana Devonish, petitioner's half-sister, about what the twins had revealed. (Tr. at 138).

Georgiana Devonish testified at petitioner's trial that she confronted petitioner in December 1987 about whether he was "interfering" with Anna. (Tr. at 55).[5] Georgiana reported that petitioner told her not to tell the children's father and that petitioner "won't do it any more." (Tr. at 56). Georgiana testified that on another occasion petitioner denied having intercourse with the children but admitted that "he maybe fingered them." (Tr. at 60). Georgiana also testified that in 1987 she told the twins' grandmother, Olga Sparman, about the abuse but that to her knowledge Olga never checked Anna's or Donna's physical condition, even though Olga lived with the twins and was a nurse. (Tr. at 63, 65).

For reasons unexplained in the record, Georgiana waited three and one-half years, until July 20, 1991, before she told the twins' parents, Alfred and Paulette Sparman, of petitioner's alleged abuse. (Tr. at 230). On that date, Paulette Sparman testified that she and Alfred questioned the twins and the children told them that petitioner had abused them. (Tr. at 231). Alfred Sparman then immediately took the girls to the police. (Tr. at 175, 232).

At the police station, the girls made statements regarding the abuse. According to police reports, the twins told the police that they had been abused "until recently" and, at another point, that they had been abused over the past four years. See Police Reports, July 20 and 23, 1991, Pet.Ex. "M" and

"N." In other statements and at trial, however, the twins asserted that the abuse ended when petitioner moved out of the house in 1988. See Pet.Ex. "N" at 2; (Tr. at 90, 170, 173). Similarly, the children told investigators that they were abused either in the bathroom or the bedroom or that they were "usually" abused in the bathroom. Pet. Exhibit "N" and "P." Yet, at trial Anna stated that the abuse occurred only once or twice in the bathroom, (Tr. at 165), and Donna testified that the rapes occurred "sometimes" in the bathroom. (Tr. at 90).

None of these discrepancies were raised by defense counsel at petitioner's trial.

Both twins testified that during and after the rapes they felt pain and burning and would frequently yell out and complain to petitioner about the pain. (Tr. at 87, 161). No one in the family, however, saw or noted any physical manifestations of the abuse, despite testimony by the twins' mother, Paulette Sparman, that she washed her daughters' clothing on almost a weekly basis during the period from 1986–1988 and that she bathed the girls once or twice a day and sometimes observed them when they washed their vaginas. (Tr. at 233–34). On cross-examination, Anna Sparman testified that her grandmother, Olga Sparman, a nurse, washed her and her sister, including their vaginas, during this two year period. (Tr. at 188). On direct, however, Anna testified that her grandmother had never "looked" at her vagina. (Tr. at 175). The girls also testified that aside from Dr. Nadig's 1988 examination and Dr. Baker's 1991 examinations, neither of them had ever had any other vaginal examinations. (Tr. at 128, 175).

Following their interviews with the police in 1991, the twins were taken to a hospital and examined by Dr. Mohammed Baker, an obstetrician/gynecologist. (Tr. at 175). Dr. Baker performed a gynecological exam and found "interruptions" or tears in the hymens of both girls. (Tr. at 284, 290). Dr. Baker also observed abrasions, redness and some

---

**5.** Testimony indicated that in Guyana, the term "interfering" refers to "fingering someone" or

having intercourse. (Tr. at 56).

swelling in both girls' vaginas. (Tr. at 290, 316). Dr. Baker asserted that his findings were consistent with repeated penile penetration that could have occurred as much as four years earlier. (Tr. at 285, 292). On cross-examination, however, Dr. Baker conceded that the redness and abrasions he observed also could be consistent with recent sexual activity. (Tr. at 304–05).

Dr. Baker also noticed a "whitish discharge" from Anna's vagina. (Tr. at 292, 304). The discharge, according to Dr. Baker, was a product of a yeast infection, as well as gardnerella vaginalis, a bacterial infection that can be transmitted sexually. (Tr. at 312–13). Dr. Baker did not observe any discharge from Donna's vagina. On cross-examination, Dr. Baker maintained that it was possible for both girls to have intercourse with the same individual and yet for only one girl to contract gardnerella vaginalis. (Tr. at 314, 321).

The prosecution also called Dr. Don Lewittes. Lewittes, a psychologist, testified as an expert witness regarding the psychological reasons underlying the twins' delayed disclosure of the rapes. (Tr. at 325). Although Dr. Lewittes examined neither Anna nor Donna, he testified as to the general stages that characterize the sexual abuse of children and childrens' emotional and psychological reactions to such abuse. (Tr. at 336). Dr. Lewittes testified that the failure of the twins to reveal the sexual abuse immediately was consistent with the syndrome of child sexual abuse. (Tr. at 342).

Defense counsel called only one medical witness, Dr. Paula Nadig, a pediatrician who had conducted physical examinations of the children on September 13, 1988 in connection with a follow-up appointment for previous strep throat infections. (Tr. at 389, 409). Doctor Nadig testified that during the course of those physical examinations she conducted genital examinations of the children. (Tr. at 391, 404). Dr. Nadig had each child lie down and move her legs apart; the doctor then visually inspected the labia majora, the labia minora and the vaginal area. (Tr. at 391–92). Dr. Nadig recorded that Anna and Donna Sparman were both "normal female[s], virgin[s]." (Tr. at 392–404). Dr. Nadig testified that use of the word "virgin" means that the "vagina was completely closed" and she concluded that her examinations were "inconsistent with . . . vaginal sexual intercourse." (Tr. at 393, 404–5).

On cross-examination, however, Dr. Nadig acknowledged that she did not use stirrups or bright lights to perform the vaginal examinations of the twins and did not physically see the twins' hymens. Therefore, she could not conclude with certainty that the girls' hymens were not ruptured, only that because the vaginas were so tightly closed she could not see the girls' hymens and thus assumed that they were not ruptured. (Tr. at 410, 418). Dr. Nadig noted that a child who had had sexual intercourse with an adult male would have an open vagina. (Tr. at 420, 421).

Upon taking the stand, the petitioner herein, Anthony Sparman, denied that he ever sexually abused his twin nieces, denied ever telling Georgiana Sparman that he "did something sexual" to Anna and Donna and asserted that he never has had gardnerella. (Tr. at 475–76).

During defendant's direct testimony, defense counsel began a line of questioning apparently aimed at establishing that bad blood existed between Anthony and his half-brother Alfred because of Anthony's refusal to help fund Alfred Sparman's legal expenses incurred in connection with Anthony's pending trial for sexual abuse of an eighteen year old co-worker. (Tr. at 482). When the prosecution objected, the trial court conducted one of the few recorded side-bar conferences, at which time the trial court, based on its pre-trial ruling on the clear link issue, instructed defense counsel to keep his questioning surrounding Alfred's legal expenses vague and refer to Alfred's request for money as arising from only "a time of need" and not to any specific legal troubles Alfred then faced. (Tr. at 483). Following this ruling, defense counsel, for unknown reasons, never pursued this line of questioning at all during the rest of petitioner's direct examination. Instead, counsel belatedly attempted to ask defendant on re-direct whether Alfred Sparman had ever asked defendant for money, at which time the court sustained the prosecutor's objection, ruling that the question was beyond the scope of cross-examination. (Tr.

at 506). Defense counsel did not ask any other questions of petitioner to establish the divisions within the Sparman family.

Defense counsel also started to elicit direct testimony from petitioner about an incident on Mother's Day in 1991, during which petitioner claims he saw Anna leave a family celebration with her father and return several hours later, crying.[6] Once again, the prosecutor objected, but after the trial judge permitted the inquiry, defense counsel failed to pursue this line of questioning during direct examination. (Tr. at 506). When counsel tried to inquire about the Mother's Day incident on redirect, the prosecutor objected and the court again found that the question was beyond the scope of cross-examination. (Tr. at 506).

Neither the prosecution nor defense counsel called Alfred Sparman, the twins' father, to the stand.

In his summation, defense counsel attempted to argue that the medical testimony of Dr. Nadig established that defendant was innocent. (Tr. at 671). Counsel conceded that something had happened to the twins, but that his client was not the perpetrator. (Tr. at 661–62).[7] Counsel also argued that since the children's testimony alleged actual intercourse, the jury could not convict defendant of any lesser included sexual offense. (Tr. at 663). Following this summation, the trial court upbraided defense counsel and described portions of the summation as being "to say the least, shabby." (Tr. at 687–688).

During the course of her summation, the prosecutor recounted the State's witness' testimony and argued "I, of course, believe that the evidence points to Anthony Sparman as the rapist" and that the evidence demonstrated that the rapes "clearly, clearly happened in this case." (Tr. at 693, 703). In particular, the prosecutor told the jury that Georgiana Devonish's testimony "was credible, and had the ring of truth." (Tr. at 704). Moreover, continued the prosecutor, the twins' testimony was corroborated by the physical evidence uncovered during Dr. Baker's examination. (Tr. at 700). In contrast, Dr. Nadig's examination, argued the prosecutor, was "quick" and "incomplete" and as a result Dr. Nadig's testimony regarding the twins' virginity was "offensive." (Tr. at 702, 725).

## II. *Post–Trial Procedural History*

Following his state court conviction, petitioner retained new counsel and appealed to the Appellate Division, Second Department, asserting that (1) the trial court had erroneously admitted testimony speculating that the 1991 medical findings were consistent with the 1986–1988 abuse; (2) the trial court had abused its discretion and violated petitioner's constitutional rights by precluding petitioner from arguing that his half-brother had fabricated the charges against him; (3) the prosecutor's summation had been improper and denied him a fair trial; (4) the cumulative effect of trial errors had denied petitioner a fair trial; (5) the verdict had been against the weight of the evidence; and, (6) petitioner had been denied effective assistance of counsel. Affidavit of Robert J. Anello at ¶ 10 (hereinafter "Anello"). During oral argument on petitioner's appeal, the Appellate Division panel stated that the claim regarding ineffective assistance of counsel was not appropriate for review because it depended on matters outside the record. Anello at ¶ 4. On March 7, 1994, the Appellate Division, Second Department, affirmed petitioner's judgment of conviction, finding that petitioner's conviction was supported by the twins' testimony, expert medical and psychological testimony and that the trial court's clear link ruling barring admission of Alfred's conviction for sexual abuse was proper. On August 26, 1994, the New York Court of Appeals denied Anthony Sparman's application for leave to appeal. *People v. Sparman*, 202 A.D.2d 452, 453, 608 N.Y.S.2d 672, 673 (1994), *leave to appeal denied, People v. Sparman*, 84 N.Y.2d 833, 617 N.Y.S.2d 153, 641 N.E.2d 174 (1994).

---

**6.** As hereafter discussed, this is the same day that Alfred's girlfriend, Marie Onyema, claims she saw Alfred sexually abuse Anna. *See* Affidavit of Marie Onyema, Pet.Ex. "L" (hereinafter "Onyema Affidavit").

**7.** Obviously, defense counsel had not successfully introduced *any* evidence as to who else may have committed the offense, if not the petitioner.

Three months later, on November 30, 1994, petitioner moved before the same state court judge who had presided at trial to vacate petitioner's conviction, pursuant to N.Y.Crim. Proc.Law § 440.10, on the grounds of ineffective assistance of counsel. In support of that motion, petitioner presented Anna's medical reports for the period of 1989 to 1990, which were not presented at trial but were significant for their failure to note any signs of abuse in the months and years following April 1988, when petitioner moved out of the twins' house. In addition, petitioner also submitted the affidavit of Marie Onyema, Alfred Sparman's girlfriend, which asserted that Onyema had seen Alfred Sparman abuse his daughter, Anna Sparman, on Mother's Day in 1991. Petitioner also submitted excerpts from medical journals rebutting Dr. Baker's expert conclusions that the signs of abuse observed in July 1991 would be attributed to acts committed more than three years earlier.

In denying petitioner's motion to vacate his conviction, the trial court, without conducting an evidentiary hearing, concluded that trial counsel's representation did not fall to the level of ineffective assistance of counsel. Although noting that trial counsel's evidentiary argument regarding the court's clear link ruling was "not spectacularly argued" and counsel's summation "may have been disjointed," the court concluded that, on the whole, taking into account the "overwhelming weight of the evidence" and that any errors made "did not prejudice defendant to such an extent that had they not been made, the result would have been different," the court denied petitioner's motion. *People v. Sparman,* No. 9003/91, Slip Op. at 7, 9 (Sup.Ct. Kings County April 12, 1995) (Kreindler, J.), attached as Pet.Ex. "E."

In addition, the court found that because the four medical records demonstrating that

Anna had had at least two vaginal examinations from 1989–1990 did not contain any findings regarding the "condition of the victims' vaginas or hymens," the reports did not support defendant's motion. Slip op. at 7. Similarly, the trial court concluded that the Onyema Affidavit "ha[d] no relevance to what occurred between 1986–1988" and "regards an incident [Alfred Sparman seen with his pants unzipped, penis exposed and Anna sitting on his lap with her underwear pulled down] three years after the crime, and does not establish the requisite clear link." Slip op. at 8. The Appellate Division denied petitioner leave to appeal the trial court's decision. *People v. Sparman,* N.Y.L.J., July 24, 1995 at 34 (2d Dept. July 17, 1995), attached as Pet.Ex. "G." Petitioner then filed his petition for writ of habeas corpus in this Court.

### III. *PROCEDURAL BARS TO THE INSTANT PETITION*

Sprinkled throughout respondent's papers are assertions that it would be "unfair" to consider many of petitioner's exhibits, that petitioner has failed to exhaust his state court remedies and that this Court is procedurally barred on independent and adequate state grounds from considering many of petitioner's arguments. *See* Resp. Mem. at 2 n. 1; 6, n. 2; 17–19; 36; 44 n. 23. Respondent's assertions are meritless.

Initially, respondent argues that it would be "unfair and inappropriate" for this Court to consider petitioner's Exhibits L through X because they were not admitted at petitioner's trial and therefore have not been "tested" by cross examination. Resp. Mem. at 2 n. 1. These exhibits include the Onyema Affidavit, petitioner's own affidavit, the medical records of Anna Sparman from the 1989–1990 period and police reports following the twins' examination in July 1991.[8]

---

8. At oral argument before this Court, respondent requested permission to introduce a Guyanese marriage certificate between petitioner and Marie Onyema, previously described in this Report and Recommendation as petitioner's half-brother Alfred's girlfriend. (Transcript of Oral Argument, May 23, 1996, at 35–6) (hereinafter "Oral Arg."). Respondent maintained that this was the first opportunity she had to present it before any court. (Oral Arg. at 36). As petitioner points

out, however, respondent has been in possession of this certificate since at least March 7, 1995. (Pet. Sur-reply, June 6, 1996, Exhibit "A"). Thus, respondent could have submitted this document to the state trial court while petitioner's post-trial motion was pending. As petitioner is strictly bound by the rules of presentment and exhaustion surrounding habeas corpus petitions, this Court sees no reason why respondent should not also be bound by these rules and therefore

In making this argument, respondent appears to be under the mistaken impression that in filing a federal habeas corpus petition a petitioner may only submit evidence that has been presented to the trial court. Rather, it is axiomatic that in a federal habeas corpus petition a petitioner may present any evidence or arguments that have been "fairly presented" to an appropriate state court so long as petitioner has exhausted all available state judicial remedies. *Rose v. Lundy*, 455 U.S. 509, 510–522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982); *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). "In order to have 'fairly presented' federal claims to the state court, the petitioner must have informed the state court of both the factual and legal premises of claims asserted in the federal petition." *Udzinski v. Kelly*, 734 F.Supp. 76, 79 (E.D.N.Y.1990) (*citing Twitty v. Smith*, 614 F.2d 325 (2d Cir.1979)). *See also Anderson v. Casscles*, 531 F.2d 682, 684 (2d Cir.1976).

Here, it is uncontested that the Onyema Affidavit, petitioner's Affidavit, the twins' medical records, the excerpted medical literature and the police records were presented as part of petitioner's initial direct appeal from the conviction or in his later motion before the trial court to vacate that conviction. Resp. Mem. at 2, n. 1. Since the applicable New York courts have denied further leave to appeal from the appellate and trial courts' decisions affirming the judgment of conviction, *People v. Sparman*, 84 N.Y.2d 833, 617 N.Y.S.2d 153, 641 N.E.2d 174 (1994) (re: appeal from Appellate Division affirmance of judgment of conviction); *People v. Sparman*, No. 95–04308, N.Y.L.J., July 24, 1995 at 34 (2d Dept. July 17, 1995) (re: appeal from trial court's denial of petitioner's post-trial motion to vacate his conviction), petitioner has exhausted all of his state avenues of review with regard to these exhibits.

Second, respondent asserts that this Court should not consider evidence relating to Anthony Sparman's claim that his half-brother Alfred was the true perpetrator of the sexual abuse. Resp. Mem. at 6, n. 2; 16, 19, n. 8.

Respondent maintains that specific allegations contained in petitioner's affidavit regarding his claim that he saw Anna and Alfred leave a family celebration on Mother's Day in 1991 and that upon their return later that day Anna looked "disheveled and uncomfortable," Sparman Affidavit at 4–5, are procedurally barred. The crux of respondent's argument is that trial counsel did not object when the trial court precluded him from questioning petitioner on redirect examination about what he saw on Mother's Day 1991. Consequently, respondent argues, New York's contemporaneous objection rule bars petitioner's present claim. Resp. Mem. at 19, n. 8. Respondent's contention is unavailing.

Absent a showing of cause and prejudice, failure to comply with a state rule requiring contemporaneous objections will act as an independent and adequate state ground barring federal habeas corpus review. *Wainwright v. Sykes*, 433 U.S. 72, 86, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir.1990); *Narayan v. Scully*, 741 F.Supp. 377, 380 (E.D.N.Y.1990) (Glasser, J.), *aff'd*, 927 F.2d 594 (2d Cir.), *cert. denied*, 502 U.S. 809, 112 S.Ct. 53, 116 L.Ed.2d 30 (1991). However, a finding of ineffective assistance of counsel is sufficient cause for failure to raise an objection at trial. *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir.1994), *cert. denied*, 514 U.S. 1054, 115 S.Ct. 1436, 131 L.Ed.2d 316, 63 USLW 3721 (1995). As this Court finds that petitioner's trial counsel was ineffective and that petitioner was prejudiced by this ineffectiveness, *see Section IV–A, infra*, petitioner's claims on this point are not procedurally barred.

However, even if a state procedural bar existed by virtue of trial counsel's failure to make a contemporaneous objection, the Appellate Division chose to ignore that bar. In such a circumstance, there is "no warrant . . . for guarding state procedural rules more vigilantly than the state itself does." *Ra-*

---

will not consider the proffered marriage certificate. This Court notes, however, that the marriage certificate bears solely on the credibility of Ms. Onyema as a witness asserting that she saw

Alfred Sparman abusing his daughter Anna on Mother's Day 1991, and that this Court's material findings would be the same even if the certificate were a proper part of this record.

*mirez v. Jones*, 683 F.2d 712, 715 (2d Cir. 1982) (*quoting Washington v. Harris*, 650 F.2d 447, 452 (2d Cir.1981), *cert. denied*, 455 U.S. 951, 102 S.Ct. 1455, 71 L.Ed.2d 666 (1982)). Therefore, the issue of what petitioner saw on Mother's Day 1991 is properly before this Court.[9]

Third, respondent also contends that this Court is procedurally barred from considering petitioner's claims regarding the prosecutor's summation. Resp. Mem. at 36. As noted earlier, a finding of ineffective assistance of counsel is sufficient cause for failure to raise an objection at trial. *Murray*, 477 U.S. at 488, 106 S.Ct. 2639; *Bossett*, 41 F.3d at 829. In order to overcome a procedural bar, however, petitioner must also demonstrate that the prosecutorial remarks were so prejudicial that they rendered the trial fundamentally unfair. *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *Garofolo v. Coomb*, 804 F.2d 201, 206 (2d Cir.1986).

This Court cannot find that petitioner was prejudiced by the prosecutor's comments to warrant a finding that the petitioner's constitutional rights were violated. Although, as discussed below, the petitioner's trial fell below constitutional standards in several respects, the prosecutor's summation did not render his trial fundamentally unfair. The prosecutor's comments regarding her beliefs and the credibility of some of the witnesses,

although improper, were relatively transitory and brief.[10]

As petitioner has exhausted all of his claims and no procedural bar exists to the consideration of petitioner's ineffective assistance of counsel claim and his claim concerning the trial court's key evidentiary ruling on "clear link," this Court will now consider the merits of those claims.[11]

## IV. *DISCUSSION*

### A. *Ineffective Assistance of Counsel*

Petitioner claims that his trial counsel was grossly ineffective because, *inter alia*, he did not (1) make evidentiary use of Anna's medical reports from 1989 and 1990, which failed to show any signs of abuse; (2) cross-examine the twins regarding inconsistent statements they made concerning the time period during which they were abused; (3) use expert medical literature or witnesses who would have bolstered Dr. Nadig's testimony and undermined Dr. Baker's testimony; or, (4) adequately prepare for trial and investigate and pursue potential witnesses such as identifying and using Marie Onyema as a key defense witness clearly linking Alfred Sparman to the very crimes charged against petitioner. Pet. Mem. at 38–51. For reasons set forth below, this Court finds that petitioner's trial counsel fell far short of the standards that the Constitution mandates and that this

---

9. Respondent also attempts to argue that petitioner has failed to exhaust his claim regarding what petitioner saw on Mother's Day 1991 and that therefore the petition contains both exhausted and unexhausted claims and must be dismissed pursuant to *Rose v. Lundy*, 455 U.S. 509, 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). Resp. Mem. at 19. This argument fails as petitioner fairly presented this claim to the Appellate Division on his direct appeal, *Appellant's Brief*, App.Div. No. 92–08100, April 29, 1993 at 16, attached as Anello, "Appendix," the Appellate Division ruled expressly on this claim and leave to appeal that decision has been denied. *People v. Sparman*, 202 A.D.2d 452, 453, 608 N.Y.S.2d 672, 674 (App.Div.2d Dept.1994) ("no merit to ... claim that reversible error took place when [trial] court precluded [petitioner] from introducing evidence to suggest that the victims' father was the true perpetrator"), *leave to appeal denied*, *People v. Sparman*, No. 95–04308, N.Y.L.J., July 24, 1995 at 34 (2d Dept. July 17, 1995), attached as Pet.Ex. "G." Therefore, petitioner has fully exhausted this claim.

10. This Court categorically rejects respondent's argument that defense counsel's summation warranted the prosecutor's comments. Resp. Mem at 39. Adoption of such a tit-for-tat rule of conduct would merely speed the decline of judicial decorum and encourage inappropriate and juvenile responses to improper arguments and comments. *See generally, Quartararo v. Fogg*, 679 F.Supp. 212, 243 (E.D.N.Y.) (Korman, J.), *aff'd*, 849 F.2d 1467 (2d Cir.1988).

11. The Second Circuit has ruled recently that the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (Apr. 24, 1996) [hereinafter "1996 Act"], does not apply retroactively. *Boria v. Keane*, 90 F.3d 36 (2d Cir.1996). Therefore, respondent's contention that the 1996 Act's procedural bars and heightened standards of review for habeas corpus proceedings apply to the case at bar, is unavailing.

ineffectiveness severely prejudiced petitioner and produced an unconstitutional verdict.

"An accused's right to be represented by counsel is a fundamental component of our criminal justice system." *Quartararo v. Fogg,* 679 F.Supp. 212, 239 (E.D.N.Y.) (Korman, J.) (*quoting United States v. Cronic,* 466 U.S. 648, 653, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)), *aff'd,* 849 F.2d 1467 (2d Cir.1988). Despite the central and crucial role that an attorney plays in a criminal trial, a petitioner asserting that his counsel was ineffective has a "highly demanding" burden and must overcome the "strong presumption that counsel's performance fell within the 'wide range' of professional assistance." *Kimmelman v. Morrison,* 477 U.S. 365, 382, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) (*quoting Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). This burden requires a petitioner to show that (1) counsel was "deficient," meaning that he made "errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment, and (2) the deficient performance prejudiced the defense." *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A petitioner "shows that he was prejudiced by his attorney's ineffectiveness by demonstrating that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Kimmelman,* 477 U.S. at 381, 106 S.Ct. 2574 (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052). In short, petitioner must demonstrate that counsel's errors were so serious as to deprive him of a fair trial, a trial whose result is reliable. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

State court decisions regarding the ineffective assistance of counsel are mixed questions of law and fact. *Strickland,* 466 U.S. at 698, 104 S.Ct. 2052 ("[I]n a federal habeas challenge to a state criminal judgment, a state court conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court to the extent stated by 28 U.S.C. § 2254(d)"). Although the ultimate issue of the adequacy of the representation is reviewed *de novo* by a federal court, *id.; Winkler v. Keane,* 7 F.3d 304, 308 (2d Cir.1993), *cert. denied,* 511 U.S. 1022, 114 S.Ct. 1407, 128 L.Ed.2d 79, 62 USLW 3658 (1994), the underlying factual findings upon which the state court reached its conclusion, such as whether or not counsel made an informed tactical or strategic decision not to call a particular witness, is a question of fact that is entitled to deference under 28 U.S.C. § 2254(d)(8). *Demosthenes v. Baal,* 495 U.S. 731, 735, 110 S.Ct. 2223, 109 L.Ed.2d 762 (1990).

Notwithstanding such deference, however, a federal court may reach a different factual conclusion from the state court where the state court's ruling is not supported by the record. 28 U.S.C. § 2254(d)(8); *Demosthenes,* 495 U.S. at 735, 110 S.Ct. 2223. While a petitioner must overcome "the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy,'" *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 (*quoting Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)), "not all strategic choices are sacrosanct. Merely labeling [counsel's] errors 'strategy' does not shield his trial performance from Sixth Amendment scrutiny." *Quartararo,* 679 F.Supp. at 247; *Henry v. Scully,* 918 F.Supp. 693, 715 (S.D.N.Y.1995) (finding "no possible strategy" that could have justified defense counsel in allowing codefendant's confession to be used against petitioner at trial), *aff'd,* 78 F.3d 51, (2d Cir.1996). Such is the case here.

Even upon applying these rigorous standards to the case at bar, this Court finds that petitioner's counsel at trial was grossly ineffective and that this ineffectiveness severely prejudiced petitioner. This conclusion is supported by the record at trial, the nature of the evidence presented against petitioner at trial and the evidence petitioner's trial counsel failed to present at trial.

### 1. Failure to Introduce Exculpatory Medical Evidence

Perhaps the most glaring example of trial counsel's ineffectiveness was his failure to call the doctors who examined Anna Sparman in 1989–90 or to introduce those medical reports into evidence. As noted above, two of those exams, conducted in January and

November 1990, included vaginal checks and the January 1990 exam included a vaginal swab test. Neither examination revealed any physical symptoms of sexual abuse nor noted any of the abrasions, redness or swelling observed by Dr. Baker in July 1991. These examinations are critical because they were conducted nine and nineteen months *after* petitioner had moved out of his half-brother's home and *after* the last charged crime. Thus, these medical reports, if presented at trial by petitioner's counsel, would have helped establish that physical examinations conducted after petitioner's last significant contact with the twins did not note any signs of abuse. Moreover, the examinations were obviously conducted well before Dr. Baker's July 1991 examination which revealed, among other things, vaginal redness and swelling and hymenal interruptions. Therefore, these reports offered potentially crucial support to petitioner's defense.

The Supreme Court has observed that "[a] single, serious error" can support a claim of ineffectiveness of counsel. *Kimmelman,* 477 U.S. 365, 383, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) (*citing Cronic,* 466 U.S. 648, 657 n. 20, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)). *See Mason v. Scully,* 16 F.3d 38, 43 (2d Cir.1994) (failure to object to hearsay statements of non-testifying co-defendant constituted ineffective assistance of counsel); *Henry v. Scully,* 918 F.Supp. at 713–14 (S.D.N.Y.1995) (failure to object to co-defendant's confession implicating defendant constituted ineffective assistance of counsel), *aff'd,* 78 F.3d 51 (2d Cir.1996); *DeLuca v. Lord,* 858 F.Supp. 1330, 1346–47 (S.D.N.Y.1994) (defense counsel's failure to pursue option of presenting extreme emotional distress defense constituted ineffective assistance of counsel), *aff'd,* 77 F.3d 578 (2d Cir.1996). *See also Grady v. Artuz,* 931 F.Supp. 1048, 1996 WL 346332 (S.D.N.Y. June 24, 1996) (failure to raise on direct appeal claims that indictment was duplicitous constituted ineffective assistance of counsel).

Many courts have found that the failure to introduce favorable medical testimony can constitute ineffective assistance of counsel. For example, on facts similar to the case at bar, an Illinois district court in *Williams v.*

*Washington,* 863 F.Supp. 697, 704 (N.D.Ill. 1994), *aff'd,* 59 F.3d 673 (7th Cir.1995), granted a habeas corpus petition. In *Williams,* the petitioner was convicted for indecent liberties with her adopted daughter. The conviction stemmed from the victim's June 1985 allegation that petitioner and her husband had sexually molested her in April 1984. *Id.* 863 F.Supp. at 700. Aside from not presenting evidence that no one heard an outcry despite the fact that several other people lived in petitioner's home and that the alleged victim had several inconsistencies in her story, defense counsel failed to present medical records indicating that no rape occurred. *Id.* at 705–07. Based on these and other failures, the district court granted the petition on ineffective assistance grounds. *See also Foster v. Lockhart,* 9 F.3d 722, 726–27 (8th Cir.1993) (failure of defense counsel to investigate, develop and present strong defense of impotency amounted to ineffective assistance of counsel); *Loyd v. Whitley,* 977 F.2d 149, 158 (5th Cir.1992) (failure of counsel to pursue independent psychological evaluation of defendant constituted ineffective assistance of counsel), *cert. denied,* 508 U.S. 911, 113 S.Ct. 2343, 124 L.Ed.2d 253 (1993).

In this case, in denying petitioner's Section 440 motion, the trial court concluded that Anna's four medical examinations "do not indicate that any findings were made as to the condition of the victims' vaginas or hymens" and that "[t]rial counsel's decision not to introduce these post–1988 records or call experts who would be far less effective than Dr. Nadig ... amounts to a legitimate trial strategy and will not be second-guessed." Pet. Ex. "E" at 7. This Court cannot agree with the trial court despite the deference to which the state court's finding is entitled.

According to the prosecution and the twins, petitioner, a huge (six feet four inch, 250 pound) adult male, repeatedly raped the six to eight year old twins on almost a daily basis for two years, from 1986 to 1988. It is further asserted that these rapes produced visible physical trauma that lasted at least three years until Dr. Baker's July 1991 examination. Yet, in four examinations conducted *after* the cessation of the rapes but *before* the July 1991 examination, one of

which included a vaginal swab, the treating physician did not record *any* signs of sexual abuse on Anna.

Contrary to the state court's conclusion, the absence of an entry in the medical records recording abuse lends support to the proposition that the doctor did not see any signs of abuse. As a matter of common sense, if the doctor did not observe any signs of sexual abuse, the treating physician would have had no reason to record the condition of Anna's vagina and hymen. Indeed, given the fact that in 1990 Anna was 10 years old and had allegedly been sexually abused constantly by a very large adult male for a two year period from 1986 to 1988, it is unreasonable to conclude that failure to introduce a physical examination that did not report any signs of abuse, conducted by a physician who, the State concedes, is under an obligation to report child abuse (Tr. at 396); Transcript of Oral Argument, May 23, 1996, at 42 (hereinafter "Oral Arg."), was merely a strategic decision by trial counsel.

That defense counsel's failure to introduce evidence of these examinations was not a matter of strategy and, in fact, severely prejudiced petitioner, is even more apparent when one considers the prosecution's evidence against petitioner at trial. In rendering their guilty verdict, the jury clearly chose to credit the testimony of Dr. Baker and discount the evidence offered through Dr. Nadig. Dr. Baker testified that during his thorough exam of the girls' genitalia he saw definite physical signs of sexual abuse on both girls. Dr. Nadig, however, testified that her examination was not as thorough as Dr. Baker's and, in fact, consisted of pulling the girls' underwear aside and doing a visual examination of the girls' vaginas. Although Dr. Nadig's exam did not reveal any signs of sexual abuse and, arguably, may have been sufficient on its own to raise a reasonable doubt concerning defendant's guilt, the jury clearly believed that Dr. Baker's more thorough examination sufficiently corroborated the twins' testimony and provided the requisite physical evidence to convict defendant. Indeed, in summation, the prosecutor argued to the jury that Dr. Nadig's exam supported "the People's case because you heard about

her physical examination, how quick, how brief, and how incomplete it was." (Tr. at 702).

It clearly would have been more difficult for the jury to reach a similar conclusion if presented with medical evidence and testimony that indicated that Anna Sparman had been examined *four* times, twice vaginally, after the date petitioner moved out of the twins' home, without a doctor ever noting any signs of the sexual abuse seen by Dr. Baker in July 1991. Indeed, given the nature of those exams and the fact that petitioner had left the household in or about April 1988, a reasonable jury could have concluded that Anna showed no signs of sexual abuse in 1989 and 1990 and therefore defendant could not have been responsible for the signs of sexual abuse noted by Dr. Baker in 1991.

Although not argued by respondent, it might be contended that trial counsel may have believed that the diagnosis of Anna's yeast infection in 1990 could have been interpreted by the jury as evidence supporting Baker's finding of a yeast infection in Anna in 1991 and therefore linking physical signs of the abuse closer in time to defendant's presence in the Sparman household. This speculation, however, is deeply flawed. Both Dr. Baker and Dr. Nadig testified that a yeast infection could be a product of something other than sexual abuse and is, in fact, quite common and that even newborn girls can have a yeast infection. (Tr. at 298, 407). Thus, the jury would have had an explanation other than abuse for the presence of the yeast infection in 1990.

The constitutional inadequacy of not presenting this medical testimony is further demonstrated by the fact that the mere existence of such a report contradicts the testimony of Anna Sparman and would have helped undermine her credibility in the eyes of the jury. As noted earlier, Anna testified that the only vaginal check she had ever had prior to Baker's 1991 examination was conducted by Dr. Nadig. (Tr. at 205–07). Contrary to this testimony stand the four medical examinations conducted on Anna, two of which involved vaginal checks and one of which included a vaginal swab. Obviously,

introduction of this evidence would have contradicted Anna's testimony.

While it is true that the four medical examinations presented by petitioner involve only Anna and not Donna, the presence of such examinations, their conclusions and their silence regarding any signs of abuse would have cast dark shadows over the prosecution's entire case. After all, the twins' testimony were intricately linked together and largely corroborative of each other. In the presence of credible and repeated medical evidence showing no signs of abuse on Anna in 1990, it would have been far more difficult for a jury to reasonably conclude that Donna, but not Anna, had been abused.

Interestingly, respondent presents very little argument concerning counsel's failure to introduce this evidence.[12] Rather, respondent relies on blanket conclusory statements that counsel was not ineffective simply for failing to introduce the 1989–1990 medical records. Respondent's deafening silence on this crucial question indicates respondent's inability to marshal arguments supporting petitioner's trial counsel's adequacy and lends further support to this Court's conclusion that petitioner's trial counsel was constitutionally inadequate.

2. *Trial Counsel's Failure to Investigate the Facts and Interview Witnesses Adequately*

It is axiomatic that defense counsel has a responsibility to investigate or to make a reasonable decision not to investigate law or facts relevant to plausible options. *Strickland*, 466 U.S. at 690–91, 104 S.Ct. 2052. In this case, defense counsel's efforts fell short of what the Constitution requires.

Aside from not introducing evidence at trial concerning Anna's four medical examinations (it is unclear whether defense counsel failed to uncover the reports or whether he simply did not appreciate their significance), defense counsel also failed to interview at least one person who could have testified to

Alfred Sparman's potential responsibility for the abuse seen by Dr. Baker. Pet. Ex. "X" at ¶¶ 2, 12, 14. Specifically, the failure of defense counsel to interview Marie Onyema and uncover her damaging information about Alfred Sparman's abuse of Anna proved critically damaging to defendant's case at trial. Given that petitioner had asked defense counsel to interview and investigate Alfred's girlfriends, Sparman Affidavit at ¶¶ 2, 14, and that defense counsel knew—based on petitioner's statements—that *something* had occurred between Alfred and Anna on Mother's Day 1991 to cause Anna to return to a family function upset and crying, (Tr. at 506), there is no reasonable explanation for defense counsel's failure to even contact Onyema to investigate the Mother's Day incident.

As discussed earlier, the significance of trial counsel's failure to interview Marie Onyema is at least two-fold. First, the testimony of Onyema regarding Alfred's abuse of Anna on Mother's Day 1991, as contained in the Onyema Affidavit, would have provided an alternative explanation to the jury at trial for the signs of abuse observed by Dr. Baker in July 1991. Second, Onyema's testimony would also have established a sufficient nexus between Alfred and the abuse of the twins to enable defense counsel to introduce evidence of Alfred's arrest, if not his conviction, for sexual abuse based on the theory that Alfred was highly motivated to manipulate his children to help him frame petitioner for a crime which Alfred himself had committed. Thus, the failure of defense counsel to investigate the facts and interview relevant witnesses, severely prejudiced petitioner.

a. *The Substance of the Onyema Affidavit*

Onyema's testimony charging Alfred with having abused Anna just weeks before Dr. Baker's examination, clearly would have been damaging to the prosecution's case against petitioner. In her affidavit, Onyema asserts that on Mother's Day 1991 she saw Anna

12. When asked at oral argument about these four exams, respondent stated that she was "at a loss, I haven't seen them, they weren't introduced at trial." (Oral Arg. at 43). This Court finds respondent's statement unfathomable. The four medical reports were submitted to the state courts and were considered by the trial court in petitioner's section 440 motion. These reports are clearly part of the record and have been for some time.

sitting on Alfred's lap, with her underwear pulled down, crying, and with Alfred's penis exposed. Such evidence, if presented to the jury, would have provided an alternative explanation for the signs of abuse Dr. Baker saw in his examination in July 1991.

The trial court, however, in denying petitioner's post-trial motion, clearly failed to understand the relevance of Onyema's affidavit. In that decision, the trial court concluded that "[t]he mere fact that Alfred Sparman had allegedly been observed, in 1991, committing certain acts, has no relevance to what occurred between 1986–1988." Anello, Ex. "E" at 7. Of course, this conclusion completely misses petitioner's argument that no abuse occurred from 1986–1988 and that the abuse diagnosed by Dr. Baker in 1991 was a product of Alfred's abuse of the girls sometime after 1988, specifically the Mother's Day incident in May of 1991.[13] The jury could have concluded that Dr. Baker's observations were linked only to Alfred's abuse that occurred in 1991, thereby severely impairing the prosecution's evidence against petitioner.

Compounding the trial court's error in this regard is that this alternative explanation for the abuse would have been more consistent with the state's own physical evidence. The prosecution's only medical evidence consisted of Dr. Baker's July 1991 examination conducted more than three years after the last abusive incident charged against petitioner. Dr. Baker admitted on cross-examination that the swelling and redness he saw on the girls' genitalia could have been from recent sexual activity, that abrasions such as the ones seen on the twins generally heal in a few days and that if Anna had her yeast infection for a period of years prior to Dr. Baker's examination she would have had significant episodes of white discharge that would have stained her underwear. (Tr. at 297, 300, 304–05, 310, 316).[14] In addition, Anna's infection with gardnerella coupled with petitioner's unrefuted assertion that he has never had gardnerella, may have lent further support the conclusion that Alfred, not petitioner, had abused Anna.

The prejudice that accrued from defense counsel's failure to present this argument to the jury is readily apparent. In a highly charged case involving the sexual abuse of children, petitioner failed, due to his attorney's inadequate representation, to provide the jury with a very plausible, exculpating explanation for the signs of sexual abuse seen by Dr. Baker on the two eleven year old girls in July 1991.

### b. Failure of Trial Counsel to Establish "Clear Link"

Additionally, as noted earlier, the trial court barred any questions or testimony concerning Alfred's arrest or conviction for sexual abuse of an eighteen year old co-worker because the evidence presented to the trial court was insufficient to establish a clear link between Alfred and the charged crimes.

---

**13.** Despite the trial court's clearly erroneous reasons for denying petitioner's post-trial motion, this Court cannot find that the trial court's error in this regard constitutes a constitutionally cognizable claim warranting grant of petitioner's petition. Rather, the weight of authority holds that in habeas corpus proceedings federal courts do not have jurisdiction to review state court denials of motions for a new trial. See Williams–Bey v. Trickey, 894 F.2d 314, 317 (8th Cir.); cert. denied, 495 U.S. 936, 110 S.Ct. 2183, 109 L.Ed.2d 511 (1990); Franzen v. Brinkman, 877 F.2d 26 (9th Cir.) (per curiam), cert. denied, 493 U.S. 1012, 110 S.Ct. 574, 107 L.Ed.2d 569 (1989); Drake v. Francis, 727 F.2d 990, 993–94 (11th Cir.1984), cert. denied, 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 738 (1986). But see Dickerson v. Walsh, 750 F.2d 150, 152–3 (1st Cir.1984); Grace v. Butterworth, 586 F.2d 878, 881 (1st Cir.1978); Sawyer v. Mullaney, 510 F.2d 1220, 1221 (1st Cir .1975); Coogan v. McCaughtry, 958 F.2d 793, 801 (7th Cir.), cert. denied, 506 U.S. 986, 113 S.Ct. 495, 121 L.Ed.2d 433 (1992). The Second Circuit has not addressed this issue. The reason underlying this rule of federal habeas law rests with the conclusion that 28 U.S.C. § 2254 only authorizes federal courts to review the constitutionality of a state criminal conviction, not infirmities in a state post-conviction relief proceeding. Williams–Bey, 894 F.2d at 317.

**14.** Petitioner presents several medical treatises that lend support to the logical conclusion that vaginal redness, swelling and tearing is more indicative of recent sexual abuse rather than sexual abuse inflicted years earlier. See e.g., Anello Ex. "S," Allan R. De Jong, M.D. & Martin A. Finkel, D.O., Sexual Abuse of Children, 20 Current Problems in Pediatrics 491, 530–2 (Sept. 1990) (most superficial injuries will not be evident to the naked eye within 96 hours after the trauma).

Had Onyema been offered as a witness at trial, however, her testimony would have established the clear link between Alfred and the abuse of the children. Indeed, even respondent concedes that the Onyema Affidavit would have provided the clear link between Alfred and the charged crimes. (Oral Arg. at 46–7).

By failing to establish clear link, petitioner's counsel was unable to convince the trial court that Alfred's arrest for the sexual abuse of an eighteen year old co-worker was highly relevant to the defense by establishing Alfred's strong motive to frame petitioner for sex abuse and to manipulate his twin daughters' testimony to help achieve that result.

Alfred's motivation to implicate petitioner may have been prompted by fear that his abuse of his daughters had been discovered and would be revealed to law enforcement prior to his sex abuse trial. According to Marie Onyema, Alfred knew that Onyema had seen Alfred abusing Anna on Mother's Day 1991. Therefore, Alfred, who was engaged in an ongoing bitter dispute with his half-brother, coupled with fear of being exposed by Onyema at the very time he was standing trial for another sexual offense, had a strong motive, fueled by his animosity for his half-brother, to blame petitioner for the abuse of the twins. The danger that Onyema posed to Alfred may have been made more immediate by Anna's infection with gardnerella and her need for medical attention that would have revealed signs of abuse.

Another factor motivating Alfred to blame petitioner for the abuse may have been Alfred's career. Alfred, who had recently graduated from medical school and was facing a serious charge of sexual abuse of a co-worker in a doctors' lounge, could ill-afford another allegation of sex abuse. Indeed, as Alfred appears to have been the primary source of income for the Sparman family in July 1991, both Paulette as well as Georgiana may have had additional reasons, beyond the ongoing family feud and animosity toward petitioner, to implicate petitioner in the abuse of the twins.

Thus, had Alfred's arrest and pending trial been presented to the jury, the jury would have learned that the only male living with the twins since June 1990 had been recently arrested for sexual abuse, was facing a trial on those sex abuse charges just nine days after he inculpated petitioner in abusing Anna and Donna, risked serious professional consequences if exposed as a child abuser and had an ongoing feud with petitioner.[15] Given this information, coupled with knowledge of Anna's four medical examinations, there is a reasonable probability that the jury's verdict would have been different.

### 3. Other Examples Demonstrating Trial Counsel's Ineffectiveness

Several other instances of trial counsel's errors and omissions lend further support to this Court's conclusion that petitioner's representation at trial was constitutionally inadequate. These instances include trial counsel's failure to introduce expert testimony or documentation supporting Dr. Nadig and rebutting Dr. Baker, his failure to expose inconsistencies in the twins' stories, his failure to follow rudimentary trial practice procedures, his failure to object to the prosecutor's summation, and his inability to formulate a coherent summation.

In a case that turned, to a large degree, on the sufficiency of the medical evidence demonstrating abuse, defense counsel failed to introduce any expert testimony regarding the physical signs of sexual abuse. Rather, defense counsel virtually rested his entire case on the testimony of Dr. Nadig. Dr. Nadig's testimony, while supportive of the inference that the children had not been abused prior to 1988 (petitioner's last contact with the twins), was susceptible to challenge due to the relative brevity of her physical examination of the twins. Defense counsel either knew or should have known that Dr.

---

**15.** Petitioner maintains that failure of the trial court to allow defense counsel to raise at trial Alfred Sparman's arrest also constituted constitutional error. As discussed in Section IV–B, *infra*, of this Report and Recommendation, however, this Court concludes that given the lack of evidence petitioner's trial counsel presented to the trial court judge, the exclusion of this evidence does not constitute constitutional error separate and apart from the ineffective assistance of counsel claim.

Nadig's testimony was going to be less than fully exculpatory, yet he failed to take any steps to buttress or support her testimony with additional medical evidence.

Aside from the obvious benefit that introduction of Anna's four medical examinations would have had, defense counsel could have introduced medical evidence either directly, through the calling of an expert on pediatric gynecology/sexual abuse, or through an effective cross-examination of Dr. Baker, providing concrete support for the common sense inference that repeated penile penetration by an adult male of six and eight year old females should result in significant, visible signs of abuse. *See* Anello, Ex. "U," David M. Paul, *What Really Did Happen to Baby Jane?—The Medical Aspects of the Investigation of Alleged Sexual Abuse of Children,* 26 Med.Sci.Law 85, 100 (1986) ("[F]requent acts of penile or pseudo-penile penetration, produce ... significant changes in the genitals. The hymenal opening heals so that the hymenal tears are no longer friable and bleed readily when touched ... [T]he vagina itself enlarges to accommodate the penis ... the vagina lengthens" and becomes more "roomy" to accommodate the width of the penis"). Instead, petitioner's trial counsel relied entirely on the testimony of one doctor who conducted a brief physical examination of the children.

Petitioner's trial counsel also failed to cross-examine the twins regarding serious inconsistencies in their stories. In their initial statements to the police in 1991, the twins said that they had been abused "over the last 4 years" and that "the last time [Anna had been raped] was at [her] grandmother's house" in April 1991. *See* Police Reports, July 20 and 23, 1991, Pet.Ex. "M" and "N." In another report, and at trial, however, the twins claimed that the abuse ceased when petitioner had moved out of their parent's home. *See* Ex. "N" at 2; Tr. at 90, 170, 173. Petitioner's trial counsel never questioned the twins about these contradictions despite the fact that the prosecution's case rested almost entirely on the credibility of the twins' testimony. If it was shown that the twins' statements and testimony regarding the timing of abuse was

riven with contradictions, the prosecution's case would have been seriously damaged.

Another example of petitioner's overall ineffectiveness was his failure to construct a coherent, consistent summation. Even the trial court told petitioner's counsel that portions of his summation were "to say the least, shabby." (Tr. at 687–688). Indeed, as petitioner presently argues, trial counsel relied exclusively on Dr. Nadig's testimony, never adequately dissected Dr. Baker's testimony, failed to highlight the three year gap between the end of the abuse and the July 1991 examination and failed to expose inconsistencies in the twins' stories regarding the abuse. (Tr. at 658–686).

Compounding petitioner's counsel's "shabby" summation was his failure to object to several of the prosecutor's summation points. In a case where it was critical to prevent the jury from focusing on the emotional aspects of the case, defense counsel failed to lodge any objections to the prosecutor's reference to her "beliefs" as to defendant's guilt, the "offensiveness" of Dr. Nadig's testimony, the credibility of the witnesses, and to the "horrible" nature of the crime. (Tr. at 703–04, 706, 711, 715, 721, 725). Although the prosecutor's summation did not, in itself, rise to the level of a constitutional violation, defense counsel's failure to object to critical elements of that summation did not aid defendant's case and stands as yet more evidence supporting the conclusion that his overall performance was constitutionally inadequate.

Petitioner's counsel also, despite explicit permission from the judge, failed to question petitioner on direct examination about both Mother's Day 1991, where petitioner saw Alfred and Anna leave a family function and return several hours later with Anna crying and looking disheveled, and petitioner's refusal to lend Alfred money in the Spring of 1991. Although the failure to question petitioner on these issues could be considered legitimate trial strategy given the limited evidentiary value of these questions (without Onyema's testimony), such a conclusion is unwarranted in this case because petitioner's counsel specifically asked for and received permission to question defendant on these topics yet then failed to ask them on direct

examination. Instead, defense counsel waited until re-direct, only to be stopped by the trial court ruling that this line of questioning was beyond the scope of re-direct. No legitimate trial strategy can explain this failure and one must conclude that counsel simply erred in failing to raise these questions on direct thereby demonstrating a failure to follow rudimentary trial procedures.

### 4. Summary of Trial Counsel's Ineffectiveness

Trial counsel's ineffectiveness is clear when one considers the evidence presented against petitioner and the evidence that should have been presented in petitioner's favor. The evidence presented against petitioner consisted of medical evidence procured three years after the last charged crime, testimony from two twelve year old girls recalling events that occurred when they were six to eight years old, an alleged admission by petitioner to a family member four years before petitioner's trial and alleged statements made by the twins to a young cousin in 1987.

Yet, defense counsel failed to pursue avenues that would have enabled petitioner to present the following evidence: (1) despite petitioner's substantial physical size and the twins' allegations that they were raped on almost a daily basis for two years, four medical reports of Anna from 1989–1990 failed to show any signs of sexual abuse and that these reports corroborated Dr. Nadig's 1988 conclusions that the girls were virgins with completely closed vaginas; (2) Marie Onyema saw Alfred sexually abuse Anna on Mother's Day 1991, just weeks before Dr. Baker's medical examination; (3) that Alfred's abuse of his daughters, coupled with his own sexual abuse arrest, provided Alfred with a strong motive to frame petitioner for abusing the children and to manipulate the twins' testimony to that end; (4) medical evidence strongly supporting the conclusion that Dr. Baker's July 1991 examination revealing redness and swelling of the twins' genitalia was far more consistent with recent abuse; (5) Anna has gardnerella but petitioner does not; (6) inconsistencies between the girls' statements and testimony regarding when the

abuse occurred; and, (7) Alfred's and other family members' animus toward petitioner due to, among other things, petitioner's failure to financially support Alfred's family while Alfred was in medical school, to lend Alfred money to fund Alfred's defense to the sex abuse charge and petitioner's failure to help Georgiana and her three children emigrate to the United States.

Clearly, given these facts and circumstances, trial counsel's utter failure to prepare and present a coherent defense severely prejudiced petitioner and led to a fundamentally unfair trial.

### B. The Trial Court's "Clear Link" Ruling

Petitioner also argues that the trial court's clear link ruling violated his constitutional rights by holding "broadly that defense counsel could not argue that Alfred or anyone else may have molested the girls." Pet. Mem. at 23. Specifically, this evidentiary ruling, maintains petitioner, denied him the opportunity to present a defense and constituted a violation of petitioner's Sixth Amendment right to confrontation, Fourteenth Amendment right to due process and his right to a fair trial under both the Sixth and Fourteenth Amendments. Id. at 27. Although well argued, petitioner's claims are unpersuasive.

### 1. Scope of Trial Court's Clear Link Ruling

As an initial matter, this Court must determine the precise nature and scope of the trial court's evidentiary ruling. At the crux of petitioner's argument is his contention that the trial court's clear link ruling prevented him from arguing that someone else abused the girls. Respondent, however, argues that the trial court's ruling prevented only the admission of Alfred's "wholly unrelated sexual abuse conviction" but did not preclude petitioner from offering any other evidence or testimony probative of a defense that Alfred Sparman was the perpetrator. Resp. Mem. at 4. After closely examining the trial record, this Court concludes that the trial court's ruling precluded only evidence and testimony relating to Alfred's arrest or conviction for sexual abuse and did not preclude

any mention of Alfred as the possible perpetrator.

In arguing that Alfred's arrest or conviction should be admitted, petitioner's trial counsel asserted that the timing of the discovery of the abuse in relation to Alfred's then-pending sex abuse trial was sufficient to establish clear link. The trial court rejected this argument and ruled that:

> I am satisfied that this is not a clear link that established that the father committed the crime, and under the circumstances, I am not going to allow you to bring [Alfred's arrest or conviction] out during the course of the trial, whether by cross-examination of the twins, or any other way.

(Tr. at 19). It is clear from the context of the court's ruling that the court's decision was based on and directed to Alfred's arrest or conviction for sexual abuse.

Indeed, as noted earlier, the trial court gave petitioner's counsel permission to question defendant about issues relating to petitioner's relationship with Alfred. Specifically, the court permitted petitioner's counsel to question petitioner on direct examination about whether he had ever lent money to Alfred and what petitioner saw on Mother's Day 1991. The trial court's allowance of these questions contradicts petitioner's present argument regarding the broad scope of the trial court's ruling.

Thus, the trial court's evidentiary rulings were not as restrictive as petitioner asserts. They merely demonstrated that—based on defense counsel's meager showing—the court was not prepared to allow the defense to introduce highly prejudicial evidence of Alfred's arrest or conviction for sexual abuse.

### 2. *Trial Court's Clear Link Ruling was not Unconstitutional*

Inquiry regarding the constitutionality of the trial court's clear link ruling must start with the general rule that state court determinations on state law evidentiary rules are given deference by a federal habeas court unless those rules deprived petitioner of a fundamentally fair trial. *Estelle v. McGuire*, 502 U.S. 62, 67–8, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *Chambers v. Mississippi*, 410

U.S. 284, 302–03, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Lipinski v. New York*, 557 F.2d 289, 292 (2d Cir.1977), *cert. denied*, 434 U.S. 1074, 98 S.Ct. 1262, 55 L.Ed.2d 779 (1978). In this case, the state evidentiary rule at issue is New York's "clear link" rule. As previously stated, this rule requires that in order for a defendant to argue at trial that a third person committed the crime with which the defendant is charged, the defendant must present some evidence linking that third person to the crime. Such evidence must present facts or circumstances that clearly implicate someone besides defendant as the guilty party. *People v. Aulet*, 111 A.D.2d 822, 825, 490 N.Y.S.2d 567, 570 (2d Dept.1985); *People v. Brown*, 133 A.D.2d 773, 774, 520 N.Y.S.2d 166 (1987), *app. den'd*, 70 N.Y.2d 953, 525 N.Y.S.2d 837, 520 N.E.2d 555 (1988).

Not surprisingly given the burden this rule places on criminal defendants, clear link has been heavily criticized by commentators as well as courts in other jurisdictions that have similar rules. *See, e.g., Wigmore on Evidence*, § 139, n. 2 (Tiller's Rev.1983) ("[I]t seems unsound as a general rule to hold that mere threats, or mere evidentiary facts of any one sort, are to be rejected if unaccompanied by additional facts pointing towards" a third person); *Winfield v. United States*, 676 A.2d 1, 1996 D.C.App. Lexis 79, *11 (April 24, 1996) (concluding that the phrase "clearly linked" is "unhelpful and should be discarded from our lexicon of terms governing the admissibility of third-party perpetrator evidence." Rather, the "usual meaning of relevance" should replace the "clearly linked" standard), *New Jersey v. Jorgensen*, 241 N.J.Super. 345, 350–51, 575 A.2d 31, 34, (in order to be admitted, evidence must merely have "rational tendency" to prove the guilt of a third person), *certification denied*, 122 N.J. 386, 585 A.2d 389 (N.J.1990). Indeed, a general rule of evidence that bars the introduction of relevant, exculpatory evidence and imposes a burden on defendants to produce another piece of evidence supporting defendant's defense strikes this Court as constitutionally questionable.

Despite this Court's doubts and serious concerns about the overall constitutionality of this rule, however, the Supreme Court has

repeatedly cautioned federal habeas courts not to correct errors of state law, *McGuire,* 502 U.S. at 67, 112 S.Ct. 475; *Lewis v. Jeffers,* 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990), and has held that federal courts must apply a fact specific case-by-case analysis to determine whether the application of a particular state rule of evidence effected an unconstitutional result. *McGuire,* 502 U.S. at 67–8, 112 S.Ct. 475; *Chambers,* 410 U.S. at 302–03, 93 S.Ct. 1038; *Lipinski,* 557 F.2d at 289. Here, this Court cannot conclude that—based on the evidence and arguments presented to the trial court—exclusion of Alfred's arrest or conviction for sexual abuse of an unrelated co-worker rendered petitioner's trial unconstitutional.

It is well established that there is no constitutional right to present irrelevant evidence. *United States v. Kasto,* 584 F.2d 268, 272 (8th Cir.), *cert. denied,* 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979); *Cruz v. Scully,* 716 F.Supp. 766, 770 (S.D.N.Y.1989). A trial court "retains wide latitude ... to impose reasonable limits on ... cross-examination based on concerns about, among other things, ... interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Jones v. Berry,* 880 F.2d 670, 673 (2d Cir.1989). In this case, in support of petitioner's clear link argument defense counsel presented the trial court only with evidence of Alfred's arrest and conviction for sex abuse of an eighteen-year old young woman. Without some probative evidence of Alfred Sparman's potential direct involvement in the sexual abuse of his own daughters, the evidence of his arrest and conviction was properly considered by the trial court to be irrelevant. Thus, the trial court's refusal to find "clear link" based on the limited evidence of Alfred Sparman's arrest and conviction for sexual abuse of an eighteen year old co-worker did not deprive petitioner of his constitutional right to present a defense and therefore, petitioner was not denied a fundamentally fair trial.

Petitioner, however, argues that in sexual abuse cases, where emotions are highly charged, a defendant's ability to present a defense is heightened and requires a trial court to exercise caution in issuing decisions restricting a defendant's ability to argue that another person was responsible for the evidence of sexual abuse. In *United States v. Bear Stops,* 997 F.2d 451 (8th Cir.1993) the defendant, who was on trial for the sexual abuse of a six year old boy, sought to introduce evidence showing that the victim had been abused by three older boys. The defendant argued that this evidence provided an alternative explanation for the prosecution's evidence showing that the victim displayed behavioral characteristics consistent with sexual abuse. *Id.* 997 F.2d at 457. Concluding that such evidence was collateral, would confuse the jury and would subject the victim to "further difficult questioning regarding such sensitive matters," the court allowed only a few "sanitized" references to the previous abuse. *Id.* at 457–58.

In reversing the district court's evidentiary ruling, the Eighth Circuit concluded that the information regarding the previous abuse was "so sanitized" that it was insufficient to effectuate the purpose for which the evidence was offered. *Id.* at 455. Rather, "[E]vidence regarding the facts of the sexual assault by the three older boys should have been admitted for the purpose of providing an alternative explanation" for the physical and mental evidence of abuse. *Id.* at 457–58. The failure of the trial court to allow the introduction of such evidence and to permit cross-examination regarding the abuse, held the court, was unconstitutional. *Id. See also Tague v. Richards,* 3 F.3d 1133, 1139 (7th Cir.1993) (concluding that because the "state introduced [evidence showing that the victim was not a virgin] with the hope that the jury would infer [that defendant] caused the hymenal condition," it was constitutional error for state court to apply the state's rape shield statute to preclude testimony that indicated that the victim's father had molested victim several years before the charged crimes); *United States v. Begay,* 937 F.2d 515 (10th Cir.1991) (where prosecution specifically relied on enlarged hymen as evidence of molestation, Confrontation Clause required admission of evidence of another source of that condition).

Respondent correctly argues, however, that the trial errors in *Bear Stops, Tague* and *Begay* involved the preclusion of evidence relating to the prior sexual abuse of the *victim* by a third person. In those cases, such evidence was relevant to explain the medical evidence of abuse. Here, however, the evidence precluded by the trial court related exclusively to Alfred's abuse of someone other than the victims, Anna and Donna. Unlike *Bear Stops, Tague,* and *Begay,* the admission of Alfred's arrest or conviction for sexual abuse of another person, without the testimony of Onyema regarding Alfred's abuse of Anna, would not have helped demonstrate that the signs of sexual abuse on Anna and Donna were caused by someone other than petitioner.

Finally, although introduction of Alfred's arrest for sexual abuse may have helped establish a motive for him to frame petitioner, without Onyema's proffered testimony demonstrating Alfred's abuse of Anna and Anna's four medical reports corroborating Dr. Nadig's testimony and the origin of the signs of abuse seen by Dr. Baker—which petitioner's ineffective trial counsel failed to present to the judge—the minimal probative value of Alfred's arrest as a motive to frame petitioner was far outweighed by the prejudicial and inflammatory effect it would have had on the jury.

In short, the trial court's clear link ruling did not render petitioner's trial unconstitutional. Given the evidence presented to the court at trial, the clear link ruling merely prevented the admission of irrelevant evidence.

## CONCLUSION

For the reasons set forth above, this Court respectfully recommends that the petition's petition be granted.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within ten (10) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**SO ORDERED.**