OPINION OF THE COURT
Seth L. Maevin, J.
On August 2, 1976, defendant was convicted of three counts of second-degree murder, two counts of first-degree sodomy, two counts of first-degree rape and fourth-degree criminal possession of a weapon. On October 25, 1976, defendant was sentenced to three indeterminate terms of imprisonment of from 25 years to life for the murder convictions and four indeterminate terms of imprisonment of from SVs to 25 years for the sodomy and rape convictions. All sentences were to run concurrently except for one sentence imposed for first-degree sodomy, which was to run consecutively. Although defendant was convicted of the weapon charge, that count was dismissed at sentencing as an inclusory count.
By a notice of motion dated April 8, 2011, defendant, through his attorneys, has moved, pursuant to CPL 440.10, to vacate the judgment of conviction, claiming that: (1) the recently-obtained blood typing evidence establishes his actual innocence and (2) his trial counsel was ineffective for failing to have his blood tested to determine his blood type and secretor status, consult with a serologist and adequately prepare to meet the People’s serological evidence.
The Trial
The People’s Direct Case
The Discovery of Karen Smith’s Body
On March 29, 1975, Christine Smith went to the police precinct and reported her daughter, eight-year-old Karen Smith, missing. At approximately 1:45 a.m., Police Officer John Robinson went to the roof of 1285 Washington Avenue to look for Karen. As he approached the top of the stairway, he observed a dead body which he later learned was Karen. Karen was only wearing socks and underwear.
*556 The Initial Police Investigation
Detective Peter Chapman arrived at the crime scene at approximately 3:45 a.m. before Karen’s body was removed. Officer Richard Clark, who knew defendant prior to March 29, informed Detective Chapman that he had observed defendant sitting on the steps of the 16th floor stairway at 1285 Washington Avenue on February 26, 1975, during a routine check of the building.
After speaking to Officer Clark, Detectives Chapman and Silverio Nucci and Detective Sergeant Joseph D’Amico went to defendant’s apartment at approximately 8:30 a.m. on March 29. Detective Chapman informed defendant that they were investigating the death of an eight-year-old child at 1285 Washington Avenue.
Detective Chapman drove defendant to the precinct and arrived there at approximately 9:05 a.m. In defendant’s presence, Detective Chapman informed the desk officer that defendant was a suspect in the homicide investigation.
Defendant’s Statements
At approximately 8:00 a.m., Detective Sergeant D’Amico assigned Officer Adrian Smith to the homicide investigation. Defendant wore a gray jacket, a sleeveless sweatshirt, white pants and sneakers. Officer Smith read defendant the Miranda warnings from an arrest report form. Defendant told Detective Nucci that between 2:30 p.m. and 10:00 p.m., he met with his friends John Robinson and Ricky Frazier separately at different times and locations, including 1285 Washington Avenue. Defendant last saw John at approximately 8:30 p.m. and Ricky at approximately 6:00 p.m.
Defendant gave a similar account to Detective Ortiz concerning his whereabouts between 2:30 p.m. and 6:00 p.m. Defendant’s account concerning his whereabouts between 6:00 p.m. and 10:00 p.m., however, was different. After getting home at about 10:10 p.m., he watched television and ate a pork chop sandwich. He watched television until about 1:10 a.m. Thereafter, he went to bed. He spoke to his stepfather, Willie Craig, at about 2:30, 3:0o.[1]
On two occasions, defendant denied knowing Karen. Detective Sergeant Brent first met defendant at approximately 7:15 p.m. at the precinct. After Detective Sergeant Brent gave defendant the Miranda warnings, he stated that he would tell him what happened. Additionally, defendant stated that “I think I need help.”
*557 Defendant told Detective Sergeant Brent the following: he saw Karen, whom he knew by sight and not by name, standing by the elevator in the lobby. They got on the elevator together. As the elevator proceeded to the 12th floor, he asked Karen if she wanted to have sex with him. Karen responded that she did not know. When the elevator door opened on the 12th floor, defendant told Karen not to be afraid and to go upstairs with him. When the elevator door closed, defendant pressed the button for the 16th floor.
When they got to the top floor landing, defendant unscrewed the light bulb. He then told Karen to take off her clothes. After defendant “dropped [his] pants,” they had intercourse. Defendant could not remember if he inserted his penis into Karen’s rectum. Defendant got hot, nervous and began to “shake all over.” Defendant remembered grabbing and shaking Karen. Defendant remembered “leaving and going down the back stairs.” When Detective Sergeant Brent asked him what happened after that, he stated that he did not know because sometimes he would “kind of black out.” Defendant stated that “when I came to on a park bench outside of the project, I remember having a knife.”
Assistant District Attorney (ADA) Edward Hayes arrived at the precinct after 9:00 p.m. After ADA Hayes read the Miranda warnings to defendant, he stated that he would tell ADA Hayes what he had done. Defendant’s statements were substantially similar to the ones given to the police, but in greater detail.
Defendant stated that he called “Michelle,” but denied that he told her what happened. Defendant denied that he called his girlfriend Denise after he got home. Defendant acknowledged that he did “something that just didn’t seem right” and that “deep down inside I didn’t want to do it.” Defendant said that “I’m sorry I did it.”
Circumstantial Evidence Linking Defendant to the Crime
After making statements to Detective Ortiz, Officer Smith and Detective Gonzalez went to defendant’s apartment and spoke to defendant’s stepfather. The police conducted a search for pork chop bones in the garbage cans in the apartment. Additionally, they inspected six garbage cans that were in the vicinity of defendant’s apartment, but were unable to locate any pork chop bones.
John saw defendant at around 1:00 p.m. on March 28. They played basketball in the park. He was with defendant for ap *558 proximately two hours. He last saw defendant at approximately 6:00 p.m. when defendant walked past him. At that time, defendant wore the same clothes as the ones when he played basketball earlier, including a sweatshirt and light colored pants.
Ricky saw defendant arguing with John Friedman at around 3:30 p.m. on March 28. Friedman observed a steel knife that was approximately 9V2 inches long inside a leather case that was on defendant’s belt. After 4:00 p.m., Ricky never saw defendant again. When Ricky saw defendant, defendant wore white pants, sweatshirt, gray coat and sneakers.
Just before dark on March 28, Karen’s friend, nine-year-old Billy Tylor, observed her playing on a pole while defendant sat on the bench. Billy heard defendant ask Karen for some candy, but she refused to give it to him. Thereafter, Billy went home at 1285 Washington Avenue.
Later in the evening, while standing in front of his building, Billy saw Karen walk to a store called “Harry’s” that was located across the street on the corner. Billy, who knew defendant, saw him walking up and down past the store. During that time, defendant wore a gray sweatshirt and white pants. After returning to his apartment and telling his mother that Karen had not returned from the store, Billy went back downstairs, but he never saw Karen again.
Walter Smith, Karen’s oldest brother who knew defendant, lived with Karen. In 1974, as he was walking through the back door of 1285 Washington Avenue, Karen ran to him and screamed. Karen told Walter that defendant had thrown a piece of glass at her. When Walter asked defendant why he did that, he stated, “I don’t know, man. I just don’t like her.”
Michelle Lapsley had known defendant for a long time. On March 28, defendant called her at around 11:00 p.m. Defendant kept telling her that he did something to a girl. Defendant sounded nervous.
Fifteen-year-old Denise Freidman was defendant’s former girlfriend. She called him sometime between 7:00 and 7:30 p.m. on March 28. Defendant told her that he was going out. She called him again sometime after breakfast on March 29. Defendant told her that he did something to a girl. She often went to the roof at 1285 Washington Avenue with defendant to talk.
The Autopsy and Serology Evidence
On March 29, Dr. Josette Montas performed the autopsy on Karen. She noted 10 stab wounds on Karen’s chest, neck and *559 extremities. The cause of death was multiple stab wounds of the chest, lung, heart and upper extremities, hemothorax and hemopericardium. The stab wounds were caused by a knife.
Additionally, Montas found “a laceration of the rectum right at the outlet, one in the interior and one in the posterior border with some hemorrhage around the outlet and there were also some submucosal hemorrhage in the vagina outlet.” The lesions of the rectum and vagina were “fresh.” The hemorrhaging in the rectal and vaginal area were consistent with a male inserting his penis into them.
Dr. Alexander Wiener, an expert in forensic serology and immunohematology at the Office of the Chief Medical Examiner (OCME), received Karen’s blood-stained underwear from Montas. Wiener cut out several stained areas and, in one area, found a strong reaction in the acid phosphate test, a presumptive test for semen. Under the microscope, Wiener found one body identified as a sperm head in the crotch area of the underwear. He was unable to determine how long the semen stain had been on the underwear. Since semen could also be typed like blood, Wiener performed:
“grouping tests with anti-a, anti-b with a reagent called anti-h which reacts for ‘O’ and the only reaction . . . was for group ‘O’ but that was quite weak so we did a group reaction; however, the reaction was quite weak and the victim, hers was group ‘O’ so we couldn’t be sure if it came from the semen or the victim so our conclusion is that there’s human male semen on the undergarment but we cannot determine with certainty the group of the man responsible for the semen.”
Wiener cut out a stained area of defendant’s gray coat and tested it for blood. He received a positive chemical test, but when he tried to test it for human blood, he did not get a definite reaction. Wiener also received defendant’s underwear, sneakers, gray sweatshirt, socks and trousers. He did not find any stains resembling blood or semen on these items.
Wiener received swabs taken from the vaginal, rectal and mouth area of Karen from Montas. Upon analyzing them for evidence of semen, Wiener concluded that the swab from the vagina and mouth were completely negative and the one from the rectum gave a weak reaction which he discounted. In his report, Wiener indicated that no semen was present on these swabs. His assistant prepared a saline extract of defendant’s underwear to detect the presence of semen and none was found.
*560 The Defense
Defendant testified that on March 28, 1975, he wore white pants, white sweatshirt, blue sneakers and a jacket. He denied ever owning or carrying a knife. He last saw John at approximately 7:45 p.m. at a pizza shop and Ricky at approximately 3:00 p.m. Defendant went home at around 10:00 p.m. Then he went to the store around the corner and bought something to eat. Defendant went home after that and remained there the rest of the night until the next morning when the police went to his house. He showed the police the clothes he wore the day before. The police asked him to put those clothes on and go to the precinct.
Defendant admitted that he had been on the roof once at 1285 Washington Avenue with Denise. He denied turning off the light on the roof. He admitted that he wrote a letter to Ricky asking him to provide a false alibi between 7:00 and 9:30 p.m.
Defendant admitted to knowing Karen, but denied having sex with her either on March 28 or March 29. Defendant also denied sodomizing or killing her.
He admitted to throwing glass at Karen about a year before. He remembered calling Michelle, but did not call her that night to tell her that he did something to a girl.
Stipulations
On December 21, 2011, this court held a prehearing conference. During the conference, the parties agreed to the following six stipulations: (1) a person can either be a secretor or a nonsecretor (H at 5, 9); (2) a person’s secretor status is completely independent from their ABO blood type (H at 5); (3) there are four common blood groups: AB, A, B and O (H at 5); (4) ABO testing of bodily fluids was the common testing approach for biological forensic evidence in 1975 (H at 6); (5) defendant has type B blood (H at 8); and (6) defendant is a secretor (H at 8).
On February 27, 2012, during another prehearing conference, the parties agreed to the following 11 stipulations: (1) secretor status can be determined from testing of semen, saliva and other bodily fluids; (2) bodily fluid from a donor can be tested to determine that person’s ABO blood type and secretor status; (3) the absorption inhibition test was available to test secretor status and ABO blood typing before 1975; (4) in 1975, the absorption inhibition test was generally accepted by the scien *561 tifie community as a reliable method to test for secretor status and ABO typing; (5) in 1975, the absorption inhibition test was in use at the OCME; (6) ABO typing involves the detection of chemical substances (antigens) on a person’s red blood cells and in a person’s body fluids that correspond to the person’s blood type; (7) in 1975, forward and reverse ABO typing was the test routinely used on blood, as opposed to other bodily fluids, to determine blood type. It is not a test to determine secretor status; (8) in 1975, absorption inhibition testing was routinely used by the OCME to test non-blood bodily fluids, e.g. semen and saliva, to determine blood type and secretor status; (9) the absorption inhibition test was used by Wiener to test the semen stain found on the victim’s underpants; (10) the Lewis test to determine secretor status is not relevant to the issues present in this case; and (11) trial counsel never had defendant’s blood type tested (H at 33-38, 53).
On August 13 and 14, 2012, a hearing was held to determine the significance of the serology evidence presented at trial in light of the newly presented results of defendant’s blood type and secretor status. A two-page stipulation of facts, which included facts that were stipulated to at the prehearing conferences, was submitted. Additionally, the parties stipulated to the following: (1) bodily fluid from a donor can be tested to determine that person’s ABO blood type if he or she is a secretor; (2) the state never tested the blood type of defendant; (3) the secretor status of the victim is unknown; (4) the physical evidence, specifically the victim’s underwear, cannot be located and, therefore, was unavailable for re-testing; (5) the microscope slide containing seminal fluid prepared by Wiener cannot be located; and (6) autopsy samples, including body cavity swabs, cannot be located.
The Hearing on the Serology Evidence
Dr. Robert Shaler, a retired Director of the Forensic Biology Laboratory at the OCME, testified on defendant’s behalf. Shaler was the Director from 1978-1986. Marie Samples, the Assistant Director at the OCME, testified on the People’s behalf. Samples has worked at the OCME since 1990.
Forensic serology refers to the study of blood serum. There are four blood types: A, B, AB and O. The blood type is determined by the presence or absence of substances found either in a person’s blood cells or body fluids such as semen, saliva, sweat and rectal and vaginal secretions. These substances *562 are called antigens. Individuals give the same immunological reaction as the blood type in their blood. For example, a person with a blood type B will have B antigens. A person with a blood type O will not have an O antigen, but rather an H antigen. Typing antigens is helpful because it can determine the blood type of the individual who handled a certain piece of evidence. There is a limitation, however, as it cannot individualize a particular sample. Although it could be very accurate, it is not very discriminating like DNA testing.
Along with identifying an individual’s blood type, serologists can also determine an individual’s secretor status. A person is either a secretor or nonsecretor. A secretor is a person who secretes their blood type antigens into body fluids like saliva, semen or vaginal secretions. A nonsecretor, on the other hand, has none of their blood type present in these fluids. About 80% of the population are secretors.
In 1975, there was no written protocol at OCME concerning the documentation of the cases worked on. The analysts made written notations in the logbook about the observations they made. The notations were dependent on the actual analyst conducting the tests. In this case, the postmortem logbook indicated the victim’s name and the items that were submitted to the lab, including a blood sample, swabs of the vagina, mouth and rectum and the victim’s underpants. The ABO logbook recorded the ABO testings conducted on the liquid blood samples taken during the autopsy. Two tests were done to determine the victim’s ABO blood type. The results revealed that the victim had blood type O.
It was not customary to conduct other tests regarding the victim’s secretor status from the postmortem blood sample because the type of test to determine secretor status from liquid blood sample was not developed for another decade. The absorption inhibition test could have determined the victim’s secretor status by taking a sample of the victim’s postmortem saliva. The lab received and tested the buccal swab for semen with negative results. Thus, the lab had the appropriate biological material to identify the victim’s secretor status, but it did not.
The bench notes indicated that an acid phosphatase screening test was conducted on the swabs taken from the victim’s mouth, vagina and rectum. Acid phosphatase is an enzyme or substance found in every human tissue. An acid phosphatase test is a color screening test that could be used to determine whether a sample may or may not contain semen. It is not a mechanism to identify *563 the presence of semen. Semen is comprised of two parts — a liquid and solid part. The liquid part contains acid phosphatase and the solid part consists of cells. If there is a reaction to the acid phosphatase test, there would be a confirmatory test to identify the presence of semen. A strong acid phosphatase reaction does not mean that there is a large amount of semen to type the semen donor’s blood type. In other words, the amount of semen present and the amount of antigens detected have no correlation to the level of acid phosphatase detected.
The bench notes revealed that the acid phosphatase test from the vaginal and mouth swabs was negative for semen. A weak positive result was obtained from testing the rectal swab. This result was obtained since acid phosphatase is found in low levels in other substances such as bacteria and feces. A stained area of the victim’s underpants was tested and the result showed that there was a strong positive for acid phosphatase. In this test, Wiener identified the liquid part of the semen, the fraction necessary to determine blood substances and, thus, the blood group of the semen donor. In order to detect the blood group substances of the semen donor, there must be sufficient amount of seminal fluid present.
The bench notes and Wiener’s testimony showed that microscopic examination of the slides prepared from the saline extracts of the cutting from the victim’s underpants yielded one sperm head and detritus. Wiener described detritus as junk or debris. The presence of a single sperm head does not indicate the amount of seminal fluid present. According to Shaler, the presence of the sperm head and the strong reaction in the acid phosphatase test of the stained area of the underwear suggest that there was a significant amount of semen present to type the blood group of the semen donor.
The bench notes also indicated that the grouping tests by the absorption inhibition method were conducted on the stained area of the victim’s underpants. The result from this test indicated that the H antigen was detected, but it yielded a weak result. According to Samples, a weak result means that there is a small amount of H antigen present and it could be because there was not very much of the body fluid to start with or it could mean that the person donating the body fluid naturally has a low level of antigens in his or her body fluid.
According to Shaler, an examination of the bench notes and a review of Wiener’s testimony suggest an alternative interpretation for the presence of the H antigen on the victim’s under *564 pants. Shaler concluded that Wiener’s testimony opened the question of whether vaginal secretions were present, particularly since Wiener did not document seeing vaginal secretions or vaginal epithelial cells.[2] Further, Shaler noted that given the victim’s age, one would expect that under normal circumstances, the amount of vaginal discharge present on the underwear would be minimal, if even present.
These objective findings (no evidence of vaginal secretions noted in Wiener’s report and a young victim), along with the fact that the vaginal swab yielded a weak acid phosphatase reaction (which, according to Shaler, suggests that there was no vaginal secretion from the victim), suggest that vaginal secretions in sufficient quantity to identify a blood group were not present.[3] Thus, according to Shaler, the ABO testing using the absorption inhibition test identified the blood type of the semen donor, type O. Shaler concluded that since defendant is a secretor and his ABO blood type is type B, he is excluded as the semen donor. This conclusion assumes that there was enough semen present to detect the ABO blood type and the semen donor had high levels of ABO antigen.
Samples testified that it would have been preferable to know the secretor status of the victim. Without knowing the secretor status of the victim, both parties are required to make assumptions about the evidence. The assumptions include the following: (1) if there were no epithelial cells present, then all the acid phosphatase detected from the stain in the victim’s underpants must have come from the semen; (2) if there was enough male substance to detect antigens, defendant would be excluded as the perpetrator; (3) if there was enough male substance to detect and the victim was a nonsecretor, defendant would be excluded as the perpetrator; (4) if the victim was an O secretor and there was enough male substance to detect, defendant would be excluded as the perpetrator.
*565 Wiener’s ultimate conclusion concerning the serology evidence was that the finding of the H antigen did not lead to a conclusion about the semen donor type because the victim had blood type O. In making this conclusion, Wiener made an implicit assumption that the victim was a secretor and the semen donor had a blood type O. Samples concluded that Wiener’s conclusion is consistent with her conclusion because ABO testing has great limitations. One of them is “unless you find [ABO antigens] foreign to the victim, you really can’t draw a conclusion about the ABO type of any other donor to that sample; all you find can be explained as coming from the victim.”
Samples concluded that the blood type and secretor status of defendant is not relevant since the data generated from the testing of the underpants in 1975 gives no conclusive evidence of the blood type and secretor status of the semen donor.
The Hearing on the Claim of Ineffective Assistance of Counsel
On January 10, 2013, a hearing was conducted on the issue of ineffective assistance of counsel. Trial counsel, Paul I. Auerbach, testified on behalf of defendant. Auerbach was admitted to the New York State Bar in 1955. He practiced criminal law for approximately 20 years in the Bronx.[4] He was on the 18-B homicide panel. He could not recall the number of jury trials, including homicide cases, he conducted. Auerbach currently has a private practice in elder law in Florida.
He could not recall anything about this case from memory. After reading the trial transcript, he is certain that he was defendant’s trial attorney. There was no strategic reason for not having defendant’s blood type determined and consulting with a serologist. It was just not on his “radar” to do so. During the time of defendant’s trial, Auerbach was a member of the Bronx Bar Association. It was not his practice to retain a serologist in 1975 and 1976 and it was not something that was commonly discussed among the defense bar. He recalled that at one point in his career, he had asked a prosecutor for the results of the sexual assault kits in a rape case since he was going to consult *566 with a serologist. He never got a chance to do that since the kits were destroyed.
Post-Hearing Memorandum of Law
Defendant contends that the forensic evidence supports his claim of actual innocence. Further, defendant contends that his trial counsel was ineffective for failing to perform a routine test to determine his blood type and secretor status and failed to adequately prepare to meet the serology evidence introduced by the People. Defendant asserts that trial counsel’s cross-examination of Wiener suggests that he knew nothing about the serological evidence and his summation refutes any notion that he had any awareness that the serological evidence had the capacity to prove his innocence.
Defendant points out that trial counsel never asked Wiener on cross-examination about an individual’s secretor status, the difference between a secretor and nonsecretor, the secretor status of the victim or his secretor status. Furthermore, trial counsel failed to ask Wiener whether the fact that the victim’s secretor status was unknown impacted in any way his conclusion that he could not determine whether the O group reaction in his testing of the semen stain came from the victim or from the semen donor.
Defendant asserts that trial counsel never asked these questions because he failed to retain a serology expert to assist him to understand the forensic evidence available in this case. Defendant contends that trial counsel had no strategic or other legitimate explanation for failing to consult with such an expert or to test him to determine his secretor status and blood type.
The People contend that, in light of the inconclusive scientific findings presented at trial which did not implicate defendant, there was no need for trial counsel to risk seeking additional information that could possibly incriminate defendant further. According to the People, whatever benefits might have been gained were not worth the danger of hiring an expert who potentially could have uncovered information that could have quite possibly undermined defendant’s case.
The People point out that defendant’s secretor status is not the only critical factor in determining how relevant the serology results are in this case. The People assert that the victim’s secretor status is an essential element in determining how probative, if at all, the existence of the H antigen on the victim’s underwear is. Since the forensic evidence at trial did not draw a *567 direct connection between the victim and defendant, the People contend that it is improbable that calling a defense expert could have or would have changed this given the forensic limitation of the crime scene samples. Thus, the People claim that counsel’s omission cannot be viewed as deficient viewed in totality of the circumstances and as of the time of representation.
Legal Analysis
A defendant’s right to the effective assistance of counsel is guaranteed by both the United States and New York Constitutions. Under federal law, defendant bears the burden of proving both that counsel’s performance was deficient and that he suffered prejudice due to that deficiency. (See Padilla v Kentucky, 559 US 356, 366 [2010], citing Strickland v Washington, 466 US 668, 688, 694 [1984].) Under the first prong of the Strickland test, in order to establish that he was denied his right to effective assistance of counsel, the defendant must show that defense counsel’s performance was not reasonable under the prevailing professional norms. (Id. at 688.) The second prong requires the defendant to show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. (Id. at 694.) A court need not decide both prongs of the Strickland test if the defendant has made an insufficient showing on one. (Id. at 697.)
To determine whether a defendant is denied his right to effective assistance of counsel as provided under the New York State Constitution, the New York Court of Appeals has adopted the first prong of the federal Strickland test. (See People v Turner, 5 NY3d 476 [2005].) In place of the federal requirement that a defendant show actual prejudice, the state has adopted a rule that is somewhat more favorable to defendants. (Id. at 480.) In fact, the New York standard is more expansive than Strickland and would provide relief to some defendants who would not be entitled to relief under federal law. (Bohan v Kuhlmann, 234 F Supp 2d 231, 254 [SD NY 2002].) The core of the inquiry in New York is whether counsel’s performance viewed in totality amounts to meaningful representation. (People v Baldi, 54 NY2d 137, 146 [1981].) The meaningful representation test is more favorable to a defendant since it focuses on the fairness of the process as a whole rather than its particular impact on the outcome of the case. (People v Ozuna, 7 NY3d 913, 915 [2006].)
*568 The state standard for determining meaningful representation does not require a defendant to fully satisfy the prejudice test of Strickland, but courts will regard a defendant’s showing of prejudice as a significant but not indispensable element in assessing meaningful representation. (People v Caban, 5 NY3d 143, 155-156 [2005].) While a showing of prejudice is not indispensable to establishing a lack of meaningful representation, the alleged ineffectiveness in the absence of prejudice would, nevertheless, have had to have rendered the proceedings unfair as a whole. (People v Stultz, 2 NY3d 277, 284 [2004].) Put another way, the lack of prejudice is not dispositive since the proper analysis is not one of strict harmless error. It entails whether counsel’s actions deprived defendant of a fair trial. (See People v Benevento, 91 NY2d 708, 714 [1998]; People v Nesbitt, 89 AD3d 447, 451 [1st Dept 2011].)
It is incumbent on the defendant to demonstrate the absence of strategic or other legitimate explanations for counsel’s alleged shortcomings. (People v Rivera, 71 NY2d 705, 709 [1988].) A single error may qualify as ineffective assistance, but only when the error is sufficiently egregious and prejudicial as to compromise a defendant’s right to a fair trial. (Caban, 5 NY3d at 152.)
At the hearing, trial counsel could not remember any details about this case, let alone offer a legitimate explanation for not having defendant’s blood type determined and consulting with a serologist. His failure to have defendant’s blood type determined and consult with a serologist was not part of a legitimate strategy; it was the result of neglect and ignorance. Indeed, trial counsel admitted that it was not on his “radar” to consult with a serologist and have defendant’s blood type determined.
Had trial counsel consulted with a serologist, he would have learned about many important factors that could have assisted him in effectively cross-examining Wiener. For example, he would have learned that, in 1975, the absorption inhibition test was available to test the secretor status and that secretor status could be determined from semen, saliva and other bodily fluids. Trial counsel would have also learned that, in 1975, the absorption inhibition test was routinely used by the OCHE to test non-blood bodily fluids, like semen and saliva, to determine blood type and secretor status. Additionally, he would have learned about the difference between a secretor and nonsecretor.
Had trial counsel consulted with a serologist before trial commenced, he could have asked the OCME to determine the *569 victim’s secretor status based on the oral swab that was taken at the time of autopsy. Had trial counsel asked that defendant’s blood type and secretor status be determined before trial commenced, he would have learned that defendant had blood type B and was a secretor. There was no sound reason for counsel to forgo having defendant’s blood type and secretor status determined since he had nothing to lose. Had the results indicated that defendant had type O blood and was a secretor or that he was a nonsecretor and could not therefore be excluded as the semen donor, those results would not have been admissible under the controlling law at the time of defendant’s trial. (See People v Macedonio, 42 NY2d 944, 944 [1977] [“Proof that defendant had type ‘A’ blood and that the semen found within the victim was emitted from a male with blood of that type should not have been admitted, in view of the large proportion of the general population having blood of said type”]; People v Robinson, 27 NY2d 864 [1970] [same].)
Given what we now know about the various serological testings that were available prior to defendant’s trial and the significance of the results, it is evident that trial counsel’s cross-examination of Wiener was inadequate. Trial counsel only asked two questions concerning the different blood types. The first was whether there were blood types A, B and O. The second was whether there was a blood type called H.
Wiener’s conclusion that he could not be sure whether the group O reaction in the testing of the semen stain derived from the victim, who had type O blood, or from the semen donor assumes the fact that the victim was a secretor, the semen donor was a secretor who had high levels of ABO antigen and that there was enough semen present in the underpants to detect the ABO antigen.
During the cross-examination of Wiener, however, trial counsel never asked him about the victim’s or defendant’s secretor status. In fact, trial counsel never asked Wiener about the difference between a secretor and nonsecretor. Trial counsel never asked Wiener whether the fact that the victim’s secretor status was unknown impacted in any way his conclusion that he “cannot determine with certainty the ABO group of the man responsible for the semen” (tr at 266). He also did not ask whether the fact that defendant was a secretor with blood type B impacted his conclusion that he could not determine whether the O group reaction derived from the victim or the semen donor.
*570 Although the People’s expert witness stated that it would have been preferable to have known the victim’s secretor status, such information would not have been relevant. Whether the victim was a secretor or nonsecretor, if there was enough semen present in the underpants to detect the ABO antigens and the semen donor had high levels of ABO antigen, defendant would have been excluded as the perpetrator since the grouping test’s result yielded the presence of group 0 blood type and defendant has blood type B and is a secretor.
Although there was a difference of opinion between Shaler and Samples concerning whether there was sufficient seminal fluid present to conclude that the testing of the stain in the victim’s underpants actually revealed the blood group substance of the semen donor, one would never know whether there was there was enough seminal fluid since trial counsel never asked Wiener about this vital piece of information.
Had trial counsel consulted with a serologist like Shaler, that expert would have told the jury that since there was sufficient seminal fluid present, the testing of the substance revealed the blood group substance of the semen donor. That expert’s opinion would have been based on the presence of the strong positive acid phosphatase level, the presence of the sperm head and the absence of vaginal secretions. The jury would have had the opportunity to either reject or accept the expert’s opinion that a strong positive acid phosphatase level from the stain and the presence of the sperm head meant that there was sufficient seminal fluid present. If the jury believed that the presence of blood group O belonged to the semen donor, then defendant would have been excluded as the perpetrator regardless of the victim’s secretor status. The jury, however, was deprived of this crucial information because trial counsel failed to pursue this line of inquiry; therefore, the jury had no opportunity to consider this serology evidence.
In sum, trial counsel’s lack of preparation and failure to challenge Wiener’s testimony concerning the serology evidence was not based on a sound trial strategy. Since trial counsel failed to consult with a serologist and have defendant’s blood type and secretor status determined, he was unable to effectively cross-examine Wiener. Consultation with a serologist was crucial because trial counsel had neither the education nor the experience necessary to evaluate the serology evidence and make for himself a reasonable, informed determination as to whether an expert should be consulted or called to the stand. Trial counsel *571 failed to present evidence that could have created a reasonable doubt as to defendant’s guilt. This error falls within the category of rare cases where a single error in an otherwise competent defense is so egregious and prejudicial that it deprived defendant of a fair trial. (See People v McGee, 20 NY3d 513 [2013]; Caban, 5 NY3d at 152.)
Accordingly, since trial counsel’s failures deprived defendant of a fair trial, he was ineffective. (See Sparman v Edwards, 26 F Supp 2d 450 [ED NY 1997] [counsel rendered ineffective assistance in sexual abuse case by failing to pursue basic avenues of investigation, which would have led to the discovery of two doctors whose testimony at trial might have resulted in defendant’s acquittal], affd 154 F3d 51 [1998]; People v Droz, 39 NY2d 457 [1976] [it is elementary that the right to effective representation includes the right to assistance by an attorney who has taken the time to review and prepare both the law and the facts relevant to the defense and who is familiar with, and able to employ at trial basic principles of criminal law and procedure]; People v Bennett, 29 NY2d 462, 466 [1972] [the defendant’s right to representation does entitle him to have counsel conduct appropriate investigations, both factual and legal, to determine if matters of defense can be developed, and to allow himself time for reflection and preparation of trial]; Nesbitt, 89 AD3d at 448 [where defense counsel completely abandons a viable line of argument that probably would have resulted in a different outcome, the representation may be found to have been ineffective as a matter of law]; People v Green, 37 AD3d 615, 615 [2d Dept 2007] [a failure to conduct an appropriate investigation is ineffective assistance of counsel where there was no strategic reason for the lack of investigation and such investigation would likely have revealed evidence favorable to the defense that could have been utilized at trial].)
In light of finding that trial counsel was ineffective, it is not necessary to decide defendant’s claim of actual innocence.
Conclusion
Defendant’s application to vacate the judgment of conviction, pursuant to CPL 440.10, is granted.

. The record is silent as to whether it was in the morning or afternoon when defendant spoke to his stepfather.

. Samples pointed out that the absence of mentioning the presence of vaginal secretions and epithelial cells in the bench notes, however, does not necessarily mean that none were present in the sample since the purpose of examining a sample under the microscope is to detect the presence of semen.

. Samples disagreed with Shaler’s conclusion that there was no vaginal secretion from the victim since the vaginal swab yielded a weak acid phosphatase reaction. Samples testified that the purpose of testing the vaginal swab is to look for the presence of semen and not for the cells of the victims. It is expected that when a vaginal swab is taken from a sexual assault victim, a finding of a mixture of cells from the victim and the semen donor would be present since the action of taking a swab is a rubbing motion.

. On June 21, 1976, the Appellate Division, Second Department, found trial counsel guilty of professional misconduct for neglecting to prosecute matters entrusted to him. As a result, trial counsel was censured for his misconduct. (Matter of Auerbach, 52 AD2d 491 [2d Dept 1976].)
On November 26, 1979, the Second Department upheld the Referee’s finding that trial counsel was guilty of not properly handling five different personal injury matters. As a result, trial counsel was suspended from the practice of law for three years. (Matter of Auerbach, 71 AD2d 108 [2d Dept 1979].)